Motion Industries, Inc. ("Motion"), appeals a judgment based on a jury verdict in favor of Robert Theron Pate on his complaint alleging a retaliatory discharge. See § 25-5-11.1, Ala. Code 1975. The jury awarded $40,000 in compensatory damages and $210,000 in punitive damages. Motion argues for reversal on several grounds: that the trial court erred in submitting Pate's retaliatory discharge claim to the jury because, it argues, Pate did not prove that he was discharged, or, assuming that he was discharged, did not prove that his workers' compensation claim was the sole determining factor for the termination; that the jury's compensatory damages verdict was contrary to the great weight of the evidence; that the trial court erred in submitting the punitive damages claim;[1] and that evidence regarding the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), was erroneously admitted and misled the jury.
Both at the close of Pate's case and also at the close of all the evidence, Motion moved for a directed verdict. After the court entered a judgment on the jury verdict in favor of Pate, Motion moved for a judgment notwithstanding the verdict, or, in the alternative, for a new trial. The trial court denied both. After carefully considering the record, this Court affirms.
 I. The Retaliatory Discharge Claim
Motion argues that Pate's claim of a retaliatory discharge is not supported by substantial evidence and that the trial court erred in denying its motions for a directed verdict and a judgment notwithstanding the verdict. In reviewing the denial of motions for directed verdict and J.N.O.V., this Court must apply the same standard the trial court applies to its rulings on the motions. Gold Kist, Inc. v. Griffin, 657 So.2d 826 (Ala. 1994); Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313
(Ala. 1992). This Court determines whether the party with the burden of proof produced sufficient evidence to require a jury determination of the issue. Id. This Court must view the evidence in a light most favorable to the nonmoving party and must entertain such reasonable inferences as the jury would have been free to draw. Id.
Section 25-5-11.1 provides:
 "No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter or solely because the employee has filed a written notice of violation of a safety rule pursuant to subdivision (c)(4) of Section 25-5-11."
This section was enacted to offset the harsh effects of the employment-at-will doctrine. Morgan v. Northeast AlabamaRegional Medical Ctr., 624 So.2d 560 (Ala. 1993). As remedial legislation, this section is construed liberally to effect its purposes. Twilley v. Daubert Coated Prods., Inc.,536 So.2d 1364 (Ala. 1988). For the beneficent goals of the workers' compensation chapter to be realized, the employee must be able to claim compensation for work-related injuries without being subject to reprisal. McClain v. Birmingham Coca-Cola BottlingCo., 578 So.2d 1299 (Ala. 1991).
An employee can establish a prima facie case of retaliatory discharge by proving that she or he was terminated for seeking workers' compensation benefits. That would be an impermissible reason for discharging an employee. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason; upon the employer's presentation of that evidence, the plaintiff would have to prove that the employer's reason was a pretext for an otherwise impermissible termination. Twilley v. Daubert CoatedProds., Inc., 536 So.2d 1364 (Ala. 1988). The plaintiff does not have to "prove" that the employer's stated reason is not the true reason unless the defendant's evidence would be sufficient, in the absence of more evidence from the plaintiff, to require a directed verdict. Culbreth v. Woodham PlumbingCo., 599 So.2d 1120, 1122 (Ala. 1992). *Page 727 
The defendant argues that, in the first place, it did not terminate Pate. It asserts that Pate remains on its payroll as an "inactive" employee on long-term disability. The evidence suggests a constructive termination, however, because, although he presented evidence that he was willing and able to work, he was not allowed to return to work following a back injury.Twilley, 536 So.2d 1364, 1365 (Ala. 1988). See also NationalSecurity Insurance Co. v. Donaldson, 664 So.2d 871 (Ala. 1995). Pate also presented substantial evidence of the elements of a retaliatory discharge. The evidence indicates that Pate was employed by Motion in June 1988 and that he worked both as an order picker and as a material handler before incurring an on-the-job back injury on July 18, 1989; that he was considered a hard worker, was well liked by his supervisors, and had demonstrated a willingness to learn as many jobs as he could in the warehouse so that he would be a more valuable employee; and that he had a good record of attendance and had used only a few days of his paid sick leave at the time of his injury.
Pate had worked at Motion's warehouse over one year when he was injured after lifting in succession two boxes, each weighing 175 pounds. He testified that he thought he had strained his back, but he did not report the problem at the time because, he said, he did not want to take off work and he thought the pain would go away. He did not recover as he had expected, so he reported the injury after his off day; Motion sent him to Dr. Richard Doering. Pate made a claim for workers' compensation benefits and received them until April 1990.
Dr. Doering, the company doctor, made an initial diagnosis of lumbar strain. This diagnosis was modified after Pate was given an epidural block at St. Vincent's Hospital in Birmingham, under the care of physicians other than Dr. Doering. Dr. Doering stated in his deposition that he believed Pate had an alcohol problem. His final diagnosis included peripheral neuropathy, which involves nerve damage in the extremities that can occur in persons who have abused alcohol. He based this conclusion on treatment at St. Vincent's Hospital administered by other doctors for Pate. As part of his back injury treatment, Pate was given an epidural block at St. Vincent's. Dr. Doering's testimony is conflicting as to the sequence of events, but apparently Pate suffered a seizure after, rather than before, the epidural block was administered. Pate was referred to an internist, who, according to Dr. Doering, determined that this was an alcohol withdrawal seizure. Dr. Doering stated that Pate had had no prior history of seizures. Dr. Doering then stated that radicular symptoms, which were not present in Pate according to Dr. Doering's initial diagnosis, were "felt to be secondary to alcohol." Dr. Doering admitted, when questioned by Pate's counsel, that he had no special training on the effects alcoholism would have on someone with Pate's injury and that he had done no tests himself on Pate for determining the validity of his conclusion that some of Pate's symptoms were related to alcohol abuse.
Pate's testimony was that the only injury he had ever suffered was an injury to his knee while serving with the military forces in Vietnam. He testified that he had had no problems with his back before the injury at Motion in July 1989. Pate stated that in the past he had drunk "too much liquor" but that he was currently sober. It was undisputed that drinking had never interfered with Pate's work at Motion. This conformed with evaluations by Motion, which were consistently positive. His first employee evaluation indicated "excellent" attendance and attitude, and all other categories were "satisfactory" or better. The evaluator noted, "Theron shows a desire to learn as much as he can and is a consistent worker." The record also shows that a second evaluation, occurring about one month before his injury, was positive in almost every category. The only less-than-satisfactory rating was a "fair" on productivity: "Theron needs to improve his line average." R.T. 44. Pate explained that at the time of that evaluation he had recently moved from the job of material handler to the job of order picker and was still adjusting to the new assignment.
Dr. Doering did not certify Pate to return to work until April 1990, because of the seriousness of Pate's injury, although Pate *Page 728 
had continually urged Dr. Doering to allow him to return to work. The doctor recommended in his release letter that Pate refrain from any activity that required much driving, that he refrain from "prolonged standing," and that he refrain from lifting more than 15 to 20 pounds on a repetitive basis. He stated at his deposition (entered into evidence at trial) that those numbers were "kind of arbitrary," because of the difficulty of quantifying lifting restrictions. He also recommended that Pate be given a job in which he could move around a great deal of the time. Based on information indicating that Pate in his former capacity at Motion was required to lift 175 pounds on a regular basis, Dr. Doering would not certify Pate to return to his previous position.
Pate testified that he went straight from the doctor's office to Motion to resume work. He was told that he could not return to work without first talking to Joe Carmichael, warehouse distribution center manager, and that Carmichael was unavailable for a week. In the meantime, Motion received notice from Dr. Doering of Pate's release and his restrictions. When Pate was able to speak with Carmichael the following week, Pate said, Carmichael informed him that he could not resume work at Motion. According to Pate, Carmichael had also informed him that he "had to be 100 percent and be released from the doctor" before he could return to work.
Carmichael maintained during his deposition, entered into evidence at trial, that, within 10 days of Pate's release by Dr. Doering, Pate had confided in Carmichael that Pate could not lift his baby and would never be able to come back to work:
 "Theron came in and sat down and talked to me. He and I had gone fishing together and a couple of different things. So we knew each other pretty well. He'd come down there and sat down and talked to me, and he said, 'I can't even lift my baby.' He said, 'If the baby gets in my lap he has to crawl up on the couch and crawl up in my lap,' he said. 'I can't bend over to lift him,' he said. 'I know there is nothing in this warehouse I can do,' he said. 'I don't know what I'm going to do.'
 "And I asked him, I said, 'Well, have you thought about trying to get rehab so you could do something maybe at a clerical job?'
 "And that was basically the end of the conversation as far as that went. He wasn't, you know, he just came in to talk to me for a few minutes. He knew that the job he had been doing in the warehouse that at that point he was not capable of doing.
 "Q: Is that all that took place in that conversation?
 "A: We chitchatted for probably 25 or 30 minutes but we talked about going deep-sea fishing. We talked about two or three other things.
"Q: Have you heard from him since then?
 "A: I don't recall if he came back in a month or two after that or if it was actually before that time but I talked to him on several occasions during the time of him being out and so on and so forth. I talked to him on the phone a couple of times and talked to him. He came in my office and talked to me a couple of times.
 "Q: Anything said about what jobs he could or couldn't do in those conversations?
"A: No, sir.
 "Q: Anything said about his injury at all? Or were these just chitchat conversations?
 "A: Not other than the fact that he had told most of us that this was a re-injury of when he was doing construction work. He had been hurt similar and this was a re-aggravation of [sic] re-injury of that one.
 "Q: He told you about that [the previous injury] when he came in. When did he first tell you about that?
 "A: Oh, he probably was working for Motion five, six, seven months and I think we were on a fishing trip down in Florida.
"Q: And he told you he had hurt his back before?
"A: Yes, sir.
"Q: And you continued to employ him after that? *Page 729 
 "A: Yes, sir. He had no problem doing what we were doing. He was doing a good job."
At trial, Carmichael admitted that he had not joined Pate on a fishing trip. Carmichael at trial maintained that Pate had at one time confided that he could not pick up his baby, but he said he could not remember when he and Pate had had that conversation.
Pate testified at trial that Carmichael had arranged a fishing trip that Pate took, but that the trip was for any employees who wanted to go and could pay their expenses; also, he said, he and Carmichael had not been on a fishing trip together. Contrary to Carmichael's characterization of their relationship, Pate stated that he and Carmichael were not social friends or "buddies." Pate also testified that so far as he knew he had not suffered any injury to his back before the one that occurred at Motion and that, therefore, he had not characterized his back injury at Motion as an aggravation of an old injury and had never mentioned a previous back injury to Carmichael. Pate testified further that at one time he could not pick up his baby, but that he had recovered well beyond that point by April 1990, when he was released from Dr. Doering's care. Pate also stated that he had never told Carmichael that he would not be able to return to work. In fact, Pate stated that in each conversation with Carmichael Pate was discussing returning to work. Carmichael agreed that during Pate's recovery, when he brought slips from Dr. Doering to Motion regarding his improvement, Pate expressed an eagerness to return to work.
A personnel department manager, Patty Frye, testified that, upon receiving the letter from the company doctor concerning Pate's restrictions and the suggestion that Pate receive vocational rehabilitation, she discussed the release letter from Dr. Doering with one of Motion's attorneys. She wrote this note pursuant to the conversation with the attorney:
"4/20/90
"Talked to Susan Hughey
 "A back injury is considered as a handicap. As such we must reasonably try to accommodate his restrictions and provide a job. The alcohol problem should not be considered. She suggested that we list every type of job in W/H [warehouse] — then compare it to his restrictions, and document the file. If we can't provide a job, then explain to him that we don't have anything that would fit within his restrictions."
Supervisor Joe Carmichael then compiled a list of positions and the duties of each, including in this document reasons why Pate could not perform those jobs. However, it was undisputed, both during depositions and at trial, that Pate was trainable for a position in inventory control,[2] where lifting is not a primary function. The evidence also suggested that he could have performed the duties of a salesperson. Nonetheless, Pate was not permitted to return to work at Motion. Joe Carmichael sent Pate a letter by registered mail on April 25, 1990, stating that no work was available within Pate's restrictions but also stating that if Pate's physical condition changed then Motion would "be glad to discuss any employment opportunities at that *Page 730 
time." Pate testified that although as of April 1990 he could not lift 175 pounds, he knew the warehouse operation and knew that Motion could have put him back to work in a meaningful way without his having to lift over 25 to 30 pounds[3] repetitively.
Carmichael stated at his deposition that everyone at the warehouse was required to do some lifting. When asked the average weight that everybody in the warehouse lifts repetitively all day, Carmichael estimated an average of from 10 to 30 pounds. This estimate of repetitive lifting weight is not greatly different from Dr. Doering's recommendation.
Regarding the inventory control job, Carmichael agreed that Pate was trainable for it, but he insisted that the job requirements were outside the limitations on Pate as prescribed by the company doctor. On his handwritten list, Carmichael had noted: "Climbing up and down stairs all day. No product knowledge." He stated that he telephoned the doctor to see if the restrictions were permanent and if they were something Motion "could work with." He asserted that when he was compiling this list Dr. Doering had agreed with him that Pate would never be able to lift more than 15 or 20 pounds. Yet, this directly contradicts the recommendation that Pate not lift more than 20 pounds on a repetitive basis. In fact, Dr. Doering knew that a test had indicated Pate would be able to lift up to 50 pounds on an occasional basis, and this appears to be within the requirements of the inventory control job.
Pate's counsel questioned Carmichael about the inconsistencies:
 "Q: [reading from Carmichael's deposition] And then I went on, 'Did you do anything to contact Dr. Doering to see if this job in inventory would be what he meant by moving and would that allow him enough movement?' And your answer was 'Yes, sir. I did speak with Dr. Doering. His comment to me was that Mr. Pate needed to have some opportunity to sit for short periods of time and to be able to stand and walk and move for periods of time and nothing to exceed one or two hours.' Is that your response?
"A: Yes, sir.
 "Q: That's not what you told Dr. Doering you told the jury [sic] five minutes ago before we did all this that Dr. Doering said.
 "A: Yes, sir, but Dr. Doering did tell me his situation was permanent, not temporary.
 "Q: That seems to be very important to you this morning, Mr. Carmichael. Why was that not important enough for you to tell me that on the 22d day of November of last year [the day of the deposition]?
"A: Sir, I guess I was confused. I don't know why.
". . . .
 "Q: I don't suppose you put any other memo where you told the makers of that decision [whether to return Pate to work] that 'Theron doesn't have this product knowledge right now but we can train him.'
"A: No, sir, I did not.
 "Q: And I don't suppose you called Theron and said, 'Theron, how much mechanical experience do you have? How much industrial experience did you have before you came here?' You didn't do that, did you?
"A: No, sir, I did not.
". . . .
 "Q: And you said 'Walking [sic] up and down stairs all day.' Did you call Dr. Doering and while you were there talking to Dr. Doering and you were evaluating this so you could turn this stuff in to this committee that was going to decide whether or not Theron could return to work, when you were doing all that did you call Dr. Doering and say, 'Look, this man might have to walk up and down stairs five times an hour. Can he do that?'
 "A: I don't remember if I asked him that question or if it was in the letter he sent us that he couldn't go up and down steps.
". . . . *Page 731 
 "Q: And anywhere in your deposition did you tell me that one month after Theron was injured you had modified that warehouse to a point it would be even more difficult for someone with a back problem to work there; is that right?
"A: No, sir, I did not.
 "Q: I suppose, though, that's something you considered when you made your recommendation.
"A: Yes, sir, I'm sure it was.
". . . .
 "Q: Okay. So did you call Dr. Doering that Friday or do you think you called him the day after the 20th?
 "A: Sir, I don't remember. I know it was about that time.
 "Q: Well, you needed to do your studies on what the jobs were, I guess, before you talked to Dr. Doering.
"A: No, sir.
 "Q: Didn't. Okay. Well, if you were going to ask Dr. Doering if he could do a job, didn't you need to have a description of what that job was?
"A: Yes, sir.
 "Q: Did you do that outline of what the jobs were before you called Dr. Doering?
"A: I believe I did.
 "Q: How much study did you put in that? Is that something you just sat down and scribbled out in five minutes or did it take time?
 "A: Basically, most jobs in the warehouse are interchangeable to a point and everybody has to lift or bend or walk or carry or walk up and down steps. So without doing a detailed job description I probably wrote that out in 30 minutes to an hour or less.
 "Q: So you expect everybody in the warehouse to be able to walk up and down stairs and do lifting and everything else; right?
"A: Yes, sir.
 "Q: I'm going to read this because I assume what Dr. Doering is talking about is what he understood from somebody to be the restrictions. Page 18, line 5, he's explaining one of his reports. He says, 'Of course, I believe in one of the weekly, monthly updates of the accident I said he was totally and permanently incapacitated and couldn't do anything when, in fact, if certain restrictions could be applied, he could go back to work.'
 "And then he says, 'But then that was Motion Industries' policy at that time, was unrestricted activity or he couldn't come back. That made it hard to work with some of their people.'
 "Now, you are one of those people that he would have been referring to that he worked with on trying to get people back to work; is that right, Mr. Carmichael?
 "A: I don't think so. I think he was referring to the people he was seeing.
". . . .
 "Q: And you are stating that to this jury right now that it is not your policy that somebody has to be 100 percent or be on unrestricted activities before you take them back; is that right?
"A: Yes, sir, it never has been.
". . . .
 "Q: . . . I understand that Dr. Doering's letter to you said restricted to no more than 15 to 20 pounds on any sort of repetitive basis.
"A: Yes, sir.
 "Q: You have told this jury that you interpret that clause to mean that he never can lift more than 15 to 20 pounds and since talking with Dr. Doering, he never would be able to; is that right?
 "A: Yes, sir. And it also states that in the letter, sir.
". . . .
 "Q: Let's go to this physical capacities document now that's in evidence and we've got the date of it. And it shows he went to Dr. Doering.
"A: Yes, sir.
 "Q: . . . [W]hat does that say about his lifting capacity, please, sir?
"A: It says 'continuous lifting of 15 pounds.'
 "Q: Do that all day long, one right after another. Is that how you interpret that?
"A: Yes, sir.
"Q: Okay. What does it say? *Page 732 
"A: 'Frequent lifting of 20 pounds.'
 "Q: Okay. So very frequently he can lift 20 pounds.
"A: Yes, sir.
"Q: Okay. Then what else does it say?
"A: 'Occasional 21 to 50 pounds.'
 "Q: Okay. So do you interpret that if he didn't have to do it except occasionally he could lift up to 50 pounds.
 "A: If I had seen this letter, yes, sir, that's what I would have interpreted it.
 "Q: Okay. . . . [D]o you contend that you talked with Dr. Doering and Dr. Doering told you that it was permanent and he would never be able to lift over 20 pounds?
"A: Yes, sir.
". . . .
 "Q: That letter [referring to the release letter from Dr. Doering] is what you were using as your guideline in whatever your participation might have been in any of the discussions or preparing reports or anything regarding Theron going back to work; right?
"A: Yes, sir.
". . . .
 "Q: Okay. And that last paragraph of that letter, do you want to read that to the jury?
 "A: 'I hope that this letter will be helpful to you in further evaluation of Mr. Pate. I feel that he would be a good candidate for some sort of vocational rehabilitation program. If I can be of further assistance in any way, please don't hesitate to call or contact me.'
 "Q: Did you call Theron up, call Dr. Doering up and say, 'Hey, let's give this man some rehabilitation?'
"A: No, sir, I did not.
". . . .
 "Q: There's no question Theron wanted to work, is it?
"A: No, sir."
Pate attempted to return to work again in the spring of 1992. During this period he had been doing yard work to help his wife support them and their child. He explained to the receptionist that he had worked at Motion previously. He was told that Motion was not taking applications, and he left a message for Carmichael to call him. Carmichael never telephoned him, despite the fact that Motion had stated in its letter of April 25, 1990, that Pate should contact Motion if his physical condition changed.
"An employer could almost always say either 'we hired someone to take your place,' or 'we no longer have enough business to continue your employment.' Thus, we think a jury question is presented as to whether [the employer's] asserted reason is a legitimate one or only a pretext." Culbreth v. Woodham PlumbingCo., 599 So.2d 1120, 1123 (Ala. 1992). The circumstances surrounding Pate's attempt to return to work allow the inference that the asserted reason was pretextual. This is particularly so given the inconsistencies between Carmichael's deposition and his testimony at trial. The credibility issues present questions for the jury, and the "functional capacities form," as well as Dr. Doering's analysis, indicates that Pate was able to work in some capacity at Motion. This evidence was sufficient to warrant submitting Pate's claim for the jury's determination. The trial court properly denied the defendant's motions for a directed verdict and a J.N.O.V.
 II. Compensatory Damages
Motion argues that the compensatory damages award is contrary to the great weight of the evidence. "No ground for reversal of a judgment is more carefully scrutinized or rigidly limited than the ground that the verdict of the jury was against the great weight of the evidence." Christiansen v. Hall,567 So.2d 1338 (Ala. 1990). This Court begins with the presumption that a judgment based on a jury verdict is correct. King Motor Co. v.Wilson, 612 So.2d 1153 (Ala. 1992). That presumption is strengthened by the trial court's denial of a motion for new trial. Gold Kist, Inc. v. Griffin, 657 So.2d 826 (Ala. 1994). A judgment based upon a jury verdict and sustained by the denial of a post-judgment motion for a new trial will not be reversed unless it is plainly and palpably wrong and unjust. ContinentalEagle Corp. v. Mokrzycki, 611 So.2d 313, 320 *Page 733 
(Ala. 1992); Ashbee v. Brock, 510 So.2d 214 (Ala. 1987).
Pate is entitled to recover for lost wages and mental anguish to the extent he has not been compensated under the Workers' Compensation Act. Mokrzycki at 321. There exists "no fixed standard for the jury's determination of the amount of compensatory damages to award for mental anguish." AlabamaPower Co. v. Harmon, 483 So.2d 386, 389 (Ala. 1986). Pate presented evidence both as to his lost wages and as to mental anguish.
 A. Lost income
Pate claimed lost earnings from April 1990, when he was constructively terminated and from which date he received no further workers' compensation benefits, through December 1993. Since then, he has found employment as a taxicab driver. The parties agree that Pate's income for this period would have been something between $39,000 and $49,000. Motion, however, argues that Pate suffered no real loss because in 1991 he received a lump sum disability settlement of $11,316 and on his workers' compensation claim against Motion received a settlement of $17,000.00. Additionally, Pate earned between $5,000 and $7,000 during the period at issue doing yard work. Even if these amounts are offset against the claimed loss, the evidence indicates that Pate did suffer some loss. We note that the jury award of $40,000 reflected compensation for both lost wages and mental anguish.
 B. Mental Anguish
Motion argues that Pate presented no evidence that he suffered mental anguish because of the claimed retaliatory discharge; that argument is without merit. The evidence showed that Pate had worked from the time he was 12 years old, first delivering newspapers and then doing yard work. At age 14, he worked full-time while attending school. At 16, he began working in a machine shop. He worked later in oil fields, putting up fences and laying and inspecting pipe. He was later drafted into the military services and served in Vietnam, where he suffered an injury to his knee. After being discharged, he returned home and attended a technical school; after that, he was certified as a barber and hair stylist. He worked in a barber shop for 15 years, until increased competition led him to seek other employment. He was employed as a foreman for a general contractor for two years. When the availability of work decreased, he worked at several temporary jobs; one of these temporary jobs led to full-time employment at Motion Industries.
Pate testified regarding his feelings about being terminated: "It's just bad to know that you don't have anything coming in and it's not your fault. There is nothing you can do about it. It could make somebody do something that they don't want to do." He stated that working "feels good, from the exercise," and he said, speaking in terms of how he values himself as a person, "As long as I accomplish something and do good at it, that's what counts." He said he had always worked, had always wanted to work, and had wanted to return to work at Motion Industries.
The evidence indicates that Pate has performed various jobs that the company doctor had concluded he would not be able to perform. The doctor recommended that he not perform activities that required prolonged standing or sitting or driving, without being relieved occasionally, because of the pain. Pate performed yard work after Motion refused to put him back to work, despite the fact that yard work involves prolonged standing or sitting and bending. At the time of the trial, Pate was driving a taxi to earn a living. This evidence shows that working was important enough to Pate that in order to work he would endure pain and risk aggravation of his injury. Furthermore, Pate attempted to return to work at Motion as late as 1992; this fact supports his claim that he wanted to work at Motion Industries. The evidence supported an award of damages for mental anguish; accordingly, the compensatory damages award is not contrary to the great weight of the evidence.
 III. Punitive Damages Award
The jury awarded Pate $210,000 in punitive damages. Motion argues that Pate *Page 734 
did not present sufficient evidence for his punitive damages claim to be submitted to the jury. Under § 6-11-20, Ala. Code 1975, Pate must present clear and convincing evidence that the defendant "consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." "Clear and convincing evidence" is evidence that, "when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." See § 6-11-20(4). Further, "[p]roof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt." Id. Again, this Court observes that there is a strong presumption in favor of jury verdicts and that this Court will not disturb a verdict on the ground of insufficiency of the evidence unless it appears that the verdict was plainly and palpably wrong and unjust. Gold Kist, Inc. v. Griffin, 657 So.2d 826 (Ala. 1994). This Court holds that Pate's evidence, weighed against the evidence in opposition, could produce in the minds of jurors a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.
Pate showed that before his injury he was a well-liked employee who performed his job satisfactorily. Motion admitted that employees who had been returned to work at Motion after on-the-job injuries were employees with only temporary restrictions. This was consistent with Dr. Doering's testimony that Motion had a policy of not returning employees to work unless they were "100 percent." Motion admitted that during Pate's recovery its warehouse had been modified in a way that complicated the return of an employee with a back injury like Pate's.
Although before his injury any problem Pate may have had with alcohol consumption was not an issue for Motion, Pate's initial diagnosis of lumbar strain was changed sometime later to include alcohol-related symptoms. This change in diagnosis by Dr. Doering was based on one incident at St. Vincent's Hospital while Pate was under the care of another physician. Pate's entire personnel file was entered into evidence, and nothing in the file indicated Pate had an alcohol problem or that he had been disciplined or warned in any way. Yet, the note written by Patty Frye, the personnel manager, regarding whether to return Pate to work, mentioned "the alcohol problem." Motion based its conclusion that Pate had an alcohol problem on the diagnosis by Doering, who admitted at trial a lack of expertise in the area of alcohol-related medical problems and whose letter stated that he "believe[d]" the peripheral neuropathy was of "probable alcoholic origin." The fact that an "alcohol problem" Pate might have was documented for the first time in his personnel file only after Motion had determined that Pate's restrictions would be permanent suggests a motivation on the part of Motion to avoid returning Pate to work. This is supported by Frye's note, written pursuant to a conversation with Motion's attorney, which stated that "the alcohol problem should not be considered" in the determination of Pate's ability to return to Motion.
More significantly, Carmichael's credibility was suspect because of contradictions between his deposition testimony and his trial testimony. He admitted at trial that his deposition characterization of his relationship with Pate was not accurate. This put into question whether Pate had confided anything in Carmichael and indicated that Pate's version of events was more trustworthy. Further, Carmichael's refusal to recognize at trial, despite extensive cross-examination, the significance of the phrase "on a repetitive basis" regarding Pate's lifting restrictions indicates that Pate's actual capabilities were ignored at the time Motion determined whether it could return Pate to work. Additionally, the testimony of Motion's personnel manager, especially when considered in light of Carmichael's questionable credibility, indicated that she and Carmichael were predisposed to find that Pate could not perform any of the jobs at Motion.
 IV. The Americans with Disabilities Act
Motion also argues that the ADA was mentioned erroneously and that the *Page 735 
mention of it misled the jury. The ADA was not in effect at the time of the actions giving rise to this case, but Motion's argument is without merit. The ADA was mentioned only once in the jury's presence during the trial, and then only in a limited fashion. During cross-examination of Joe Carmichael, the ADA was mentioned as part of the inquiry by Pate's counsel concerning modifications to Motion's warehouse that were made after Pate's injury in July 1989 but before he was released to return to work in April 1990:
 "Q: . . . Well, I'm curious. Am I correct that at that point there was a great deal of discussion about accommodating disabilities and [about the] obligation of employers to accommodate disabilities and an act was passed and later modified and it's called the Americans with Disabilities Act? Are you familiar with that, please, sir?
 "Ms. Rea: Your honor, I'm going to object to this line of questioning. That has nothing to do with this case. It wasn't in effect in 1990.
 "Mr. Thomason: It was under debate and it passed, I believe, in September of 1990 and I believe it was modified in 1991.
 "The Court: I'll let him ask him whether or not he's familiar with it.
". . . .
 "Q: And you're not a stranger to the American Disabilities Act, are you sir? You know about that Act, don't you, sir?
"A: Yes, sir, I do.
 "Q: And you know it was debated in Congress for a long time before it passed, don't you?
"A: Yes, sir.
This was the extent of the questioning on the Act, and this excerpt from the record makes it apparent how limited that questioning was.
Motion points out that the ADA was discussed at another time during the trial. That discussion occurred when the jury was not even present. Motion says the ADA was mentioned on other occasions and that those references to it misled the jury; however, the instances Motion refers to were simply moments when Pate's counsel used the verb "accommodate" or some form of the verb "to train" in direct or cross-examination. Motion did not object to the use of those words. If any of those statements could have misled the jury, then the trial court's charge, which was clear as to each party's burden and as to Motion's duty to Pate, cured the error.
Accordingly, the trial court properly ruled on the motions for directed verdict, J.N.O.V., and new trial. Its judgment is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, ALMON, KENNEDY, and BUTTS, JJ., concur.
HOUSTON, J., concurs in the result.
[1] Motion also argues that the punitive damages award was excessive, but this issue is raised for the first time on appeal; therefore, we do not consider that argument.
[2] When questioned by Motion's counsel, Carmichael explained at trial the duties of inventory control personnel:
 "They take any document that comes out where somebody says 'I could not find this product.' And they try to look at the warehouse because most of the time the people in inventory control are some of our senior people and they know more about where the product would be stored than somebody coming in that's been there only six months.
 "They try to find it. If they find it they take this box and try to bring it back to the order that we shorted it on it.
 "They do shelf counts all day long. If we receive something and the paperwork shows we received 25 and the customer or the vendor that shipped it to us said they sent 30 or they said they sent 40 or whatever, we have to do a shelf count on these and in some cases pull them off the shelf because we had been sent the wrong product or too many or not enough. And they get the shelf counts back inside for the people to receive it on.
 "They also count in some parts of the day and they have to go up and down the shelf to be able to count the top shelf and the bottom shelf in the entire area.
 "Their office is on the second floor and they are up and down the steps 30 to 40 times a day [it was established that 'a day' meant an eight-hour shift]."
[3] A "functional capacities form," completed by a second doctor on March 12, 1990, and copied to Dr. Doering, suggests that Pate could lift up to 26 pounds frequently and up to 50 pounds occasionally.