Brian W. Keenon sued Leak Stop, Inc. ("LSI"), on June 14, 1995, alleging wrongful termination of his employment in violation of Ala. Code 1975, § 25-5-11.1, and the tort of outrage. Keenon later dismissed his outrage claim, and the case was tried before a jury on October 27, 1996, solely on the issue of wrongful termination. The jury returned a verdict for Keenon in the amount of $9,317 in compensatory damages and $79,750 in punitive damages on October 30, 1996, and the trial court entered a judgment upon the jury's verdict on the same date. LSI moved for a new trial, a judgment notwithstanding the verdict, and for a remittitur. Those motions were argued and denied on January 10, 1997.
LSI appealed to the Supreme Court of Alabama; that court transferred the appeal *Page 481 
to this court, pursuant to § 12-2-7, Ala. Code 1975. On appeal, LSI contends that the trial court erred in submitting Keenon's wrongful termination claim to the jury because, it argues, (1) there was insufficient evidence of Keenon's actual or constructive termination; (2) there was insufficient evidence of Keenon's willingness and ability to return to work; and (3) there was insufficient evidence that he was terminated solely as a result of his workers' compensation claim. LSI also contends that the trial court erred in denying LSI's motion for remittitur because, it contends, the punitive damages award was excessive.
The record indicates that Keenon first worked for LSI from December 1990 until January 1992. His employment was terminated by his supervisors, Richard Constantine and Henry Adams. He returned to work for LSI from June 1992 until July 1994, when he resigned because of personal reasons. As a result of a request from Constantine in late November 1994, Keenon returned to work for LSI at the beginning of 1995. At that time, LSI relocated Keenon from Texas to Decatur, Alabama.
LSI is a Texas corporation whose business involves repairing pipeline leaks without stopping the pipeline operation. Keenon knew his job responsibilities well, and he was able to train other LSI employees in the proper performance of the work. On March 25, 1995, LSI presented Keenon with a certificate of achievement recognizing the quality of his work. On April 21, 1995, Keenon and his immediate supervisor, Tim Gibson, were injured in an automobile accident while on the job with LSI. Keenon's injuries were significant, including a collapsed lung and back and rib fractures. After his hospitalization, Keenon began receiving workers' compensation benefits.
In late April 1995, Keenon hired a lawyer to represent him concerning his workers' compensation claim, and he informed Constantine of that fact in early May 1995. Keenon testified that he received two telephone calls on May 17, 1995, from LSI employees. The LSI employees who participated in these calls included Constantine, a sales manager; Adams, a vice-president; and Ron Heiskell, the president and chief executive officer. Keenon testified that during the first call, Adams threatened him with the loss of his job if he did not drop his workers' compensation claim and did not terminate his lawyer. Keenon testified that he told Adams that he would consider terminating his lawyer. During the second call, Keenon testified that Heiskell dictated a letter for Keenon to use in terminating his lawyer. Keenon testified that telephone calls to him from LSI corporate officers continued after May 17, 1995, and that the substance of those calls was that he must "get rid of" his lawyer and drop his workers' compensation claim.
Keenon further testified that the threat of losing his job frightened him and that he began keeping a log of the telephone calls and began recording them. The recordings were admitted into evidence at trial; they show that Adams and Constantine stated that Keenon would be fired if he continued to employ his lawyer concerning a possible workers' compensation claim against LSI. The recordings also show that Adams informed Keenon that he was terminated and that he would not again have a job with LSI until "you do what we told you to do." On May 31, 1995, Constantine telephoned Keenon to inform him that his termination papers were being prepared.
Keenon testified that during the time these telephone calls were being made, in late May 1995, other LSI employees, including John Kermish, Keenon's immediate supervisor, and Gary Broadway, a co-worker, were informed that Keenon had been terminated. Keenon also testified that Kermish and Broadway were sent to Keenon's residence by LSI managers to retrieve Keenon's LSI equipment and work uniforms.
At trial, Heiskell testified that Keenon had been terminated and that LSI later attempted to rehire him. However, he also testified that Keenon had not been terminated. Kermish testified that "around the end of May" Constantine told him to go to Keenon's residence to get Keenon's LSI equipment and to tell Keenon that if Keenon would terminate his lawyer there would be "no further consequences." Consistent with Keenon's testimony, Kermish also testified *Page 482 
that a few days later Constantine told him that Keenon had been terminated and that, acting on Constantine's instructions, he had told Broadway to go to Keenon's residence and pick up Keenon's LSI uniforms. However, on June 14, 1995, corporate counsel for LSI telefaxed a letter to Keenon's lawyer stating that LSI had not terminated Keenon.
Broadway's testimony was consistent with Kermish's testimony. In addition, Broadway testified that he had suffered a knee injury in June 1995 while working for LSI. Broadway further testified that he was off work for 18 weeks, that he was paid by LSI for only 6 weeks, and that he knew that he had a workers' compensation claim. He testified that he decided not to raise his claim because he had seen how LSI treated Keenon and he was afraid that he would lose his job.
Heiskell, Adams, and Constantine generally denied that they had attempted to coerce Keenon into dropping his workers' compensation claim, or that they had terminated Keenon because of his claim, although they did not deny that their voices appeared in Keenon's recorded telephone conversations. Finally, we note that Heiskell testified that LSI's treatment of Keenon regarding his workers' compensation claim "shouldn't happen anywhere."
Keenon presented evidence that for 1995, Heiskell's annual salary was $320,000, Adams's annual salary was $120,000, and Constantine's annual salary was $40,000 to $50,000. The record also contains evidence that at the time of Keenon's termination, LSI had the least number of workers' compensation claims filed against it of any comparable company conducting a similar business.
Keenon was released by his doctor to begin light-duty work on July 24, 1995. He was to begin with a four-hour day and to gradually work up to an eight-hour day over the following month. Keenon received his last workers' compensation payment for temporary disability on August 20, 1995, and he remained unemployed through October 1995. Thereafter, Keenon worked at various maintenance and painting jobs until March 1996, when he became employed with one of LSI's competitors.
 I. Sufficiency of the Evidence
LSI's first three issues challenge the sufficiency of Keenon's evidence as to particular elements of his wrongful termination claim. In pertinent part, Ala. Code 1975, §25-5-11.1, provides:
 "No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter. . . ."
In Motion Indus., Inc. v. Pate, 678 So.2d 724 (Ala. 1996), our Supreme Court discussed the proper construction of § 25-5-11.1:
 "This section was enacted to offset the harsh effects of the employment-at-will doctrine. Morgan v. Northeast Alabama Regional Medical Ctr., 624 So.2d 560 (Ala. 1993). As remedial legislation, this section is construed liberally to effect its purposes. Twilley v. Daubert Coated Prods., Inc., 536 So.2d 1364 (Ala. 1988). For the beneficent goals of the workers' compensation chapter to be realized, the employee must be able to claim compensation for work-related injuries without being subject to reprisal. McClain v. Birmingham Coca-Cola Bottling Co., 578 So.2d 1299 (Ala. 1991).
678 So.2d at 726.
LSI argues that the trial court erred in denying its motions for a directed verdict and for a judgment notwithstanding the verdict because, it says, Keenon did not present substantial evidence (1) that he was terminated, (2) that he was willing and able to return to work, and (3) that he was terminated solely because of his workers' compensation claim. Our review of the trial court's denial of LSI's motions for a directed verdict and for a judgment notwithstanding the verdict is governed by the following standard:
 "In reviewing the denial of motions for directed verdict and J.N.O.V., this Court must apply the same standard the trial court applies to its rulings on the motions. Gold Kist, Inc. v. Griffin, 657 So.2d 826 (Ala. 1994); Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313 (Ala. 1992). This Court determines whether the party with the burden of proof produced sufficient evidence to require a jury determination of *Page 483 
the issue. Id. This Court must view the evidence in a light most favorable to the nonmoving party and must entertain such reasonable inferences as the jury would have been free to draw. Id.
Pate, 678 So.2d at 726.
A careful examination of the record in this case shows that Keenon submitted ample evidence that supports the jury's verdict concerning each of the elements of his wrongful termination claim. Evidence that Keenon was terminated is shown by Keenon's testimony and the testimony and recordings of other LSI management employees. LSI's actions in retrieving its equipment and uniforms from Keenon also support the inference that it had ended Keenon's employment. Similarly, Keenon's testimony and his work history after he was terminated from LSI show his willingness and ability to return to work. Finally, the testimony and recordings of various management employees of LSI provide ample evidence that LSI terminated Keenon because he had attempted to make a claim for workers' compensation benefits. Under Pate, supra, the trial court properly denied LSI's motions for a directed verdict and a judgment notwithstanding the verdict.
 II. Punitive Damages
LSI also argues that the jury's award of punitive damages was excessive. The trial court conducted a hearing on the issue of punitive damages, pursuant to Hammond v. City of Gadsden,493 So.2d 1374 (Ala. 1986), and concluded the hearing with these remarks:
 "In this case, the defendant's Motion for a New Trial is denied. As to the punitive damages award, I find that the verdict is not excessive and that this is based on the testimony today and on the testimony at the trial using the [Life Ins. Co. of Georgia v. Johnson, 684 So.2d 685 (Ala. 1996)] standard, the [Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1
(1991)] standard, the standards that are set out in . . . [Ala. Code 1975, § 6-11-20 et seq.], [Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989)], [Hammond, supra], [Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125 (Ala. 1981)], [Wilson v. Dukona Corp., 547 So.2d 70 (Ala. 1989)], and [Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala. 1987)] . . . as a guideline. I do not find that the award is excessive as a matter of law, and I do not find that the verdict is based on bias, passion, corruption or other immaterial consideration.
 "This Court is not convinced that the financial condition of this defendant causes it to be unable to pay the judgment rendered by the jury. The jury had the entire evidence as to the matters argued in the arguments of the attorneys at this motion docket today, and I won't substitute my judgment for that of the jury. In my opinion, the judgment of the 12 people who served as jurors should stand in this case. I will not try to second-guess the jury's verdict with my opinion of the facts or the verdict amount. Accordingly, the defendant's motion for remittitur is denied."
Since the Hammond hearing, our Supreme Court has addressed the review of punitive damage awards in a number of cases, including Ford Motor Co. v. Sperau, [Ms. 1931591, September 5, 1997] ___ So.2d ___ (Ala. 1997); American Pioneer Life Ins. Co.v. Williamson, 704 So.2d 1361 (Ala. 1997); Life Ins. Co. ofGeorgia v. Johnson, 701 So.2d 524 (Ala. 1997) ("JohnsonII"); and BMW of North America, Inc. v. Gore, 701 So.2d 507
(Ala. 1997) ("BMW II"). These opinions are especially important because each of them was issued after the United States Supreme Court had remanded the case for reconsideration of the punitive damages award therein in light of BMW of North America, Inc. v.Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("BMW I").
As noted by our Supreme Court in BMW II, supra, the United States Supreme Court set out new considerations for judicial review of punitive damages awards:
 "The Supreme Court then set out the following three 'guideposts' by which a reviewing court could determine whether a punitive damages award is constitutionally excessive: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio between the plaintiff's award of compensatory *Page 484 
damages and the amount of the punitive damages; and (3) the difference between the punitive damages award and the civil or criminal sanctions that could be imposed for comparable misconduct. 517 U.S. at 575, 116 S.Ct. at 1599."
BMW II, supra, 701 So.2d at 527.
The court's analysis in BMW II recognized that the three "guideposts" set out by the United States Supreme Court in BMWI did not exclude consideration of the factors previously used by the Alabama courts in Hammond and Green Oil, supra.
 "We point out that, in providing three guideposts by which to review the excessiveness of a punitive damages award, the majority in [BMW I] did not dismiss the review process already established by this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), and upheld by the United States Supreme Court in Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Indeed, the first two 'guideposts' are already included in a Hammond-Green Oil review; the first consideration of the review is the relationship of the amount of the punitive damages award to the harm that the defendant's action has caused or is likely to cause, and the second consideration is the degree of reprehensibility of the defendant's conduct."
Id.
Accordingly, we first consider the punitive damages award in light of the three guideposts in BMW I. With respect to the degree of reprehensibility, we note that the jury had evidence from which it could reasonably infer that management employees of LSI had threatened to terminate Keenon if he did not fire his lawyer and drop his workers' compensation claim. The evidence also shows that the LSI employees acted on their threats, and the evidence supports the inference that LSI's employees acted with knowledge that they were violating the law. The jury had evidence to support the conclusion that Heiskell, Adams, and Constantine acted in concert in several different contacts with Keenon in an attempt to coerce him into dropping his claim. In addition, there was evidence before the jury to support the inference that LSI employees lied about their actions toward Keenon and attempted to hide those actions.
We also note that Keenon presented evidence from which the jury in this case could reasonably infer that LSI's managers were likely to attempt similar coercive conduct against other employees who made claims for workers' compensation benefits. Broadway testified that his knowledge of LSI's actions toward Keenon caused him to accept limited benefits rather than assert a workers' compensation claim and lose his job. LSI also admitted to having an unusually low workers' compensation claims rate. We conclude that the degree of reprehensibility in this case was high and that LSI's culpability would support a significant punitive award.
The award of punitive damages in this case was $79,750, and the award of compensatory damages was $9,317. Thus, the ratio of punitive damages to compensatory damages in this case was approximately 8.6 to 1. In discussing this second "guidepost," our Supreme Court recognized that the United States Supreme Court has never specified any mathematical formula for the review of a punitive award.
 "As to the second guidepost, the United States Supreme Court noted that the 'most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff,' and it noted '[t]he principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages.' [BMW I], 517 U.S. at 580, 116 S.Ct. at 1601. The Supreme Court rejected the notion that a purely mathematical formula could mark the constitutional line:
 " 'Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. . . . Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a *Page 485 
particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. . . . In most cases, the ratio will be within a constitutionally accepted range, and remittitur will not be justified on this basis.'
 "517 U.S. at 582-83, 116 S.Ct. at 1602-03. (Citations and emphasis omitted.)"
Johnson II, supra, 701 So.2d at 529.
In its review of the punitive award in Johnson II, our Supreme Court noted three cases out of five where the United States Supreme Court had denied certiorari review where the ratio of punitive damages to compensatory damages was 8:1 or greater. Wolfberg v. Greenberg, ___ U.S. ___, 116 S.Ct. 1847,134 L.Ed.2d 948 (1996); Murray v. Laborers Union Local No. 324,55 F.3d 1445 (9th Cir. 1995), cert. denied, ___ U.S. ___,116 S.Ct. 1847, 134 L.Ed.2d 948 (1996); and Fraidin v. Weitzman,93 Md. App. 168, 611 A.2d 1046 (1992), cert. denied,329 Md. 109, 617 A.2d 1055 (1993), cert. denied, ___ U.S. ___,116 S.Ct. 1846, 134 L.Ed.2d 948 (1996).
The Johnson II court addressed a situation where the defendant was engaging in a plan of defrauding elderly and uneducated persons by the sale of unusable health care supplements. Due to the reprehensibility of the defendant's conduct, the court found that a ratio of punitive damages to compensatory damages of 12:1 was appropriate. LSI's conduct in this case is analogous to the conduct of the defendant inJohnson II in that the evidence presented showed intentional wrongdoing that LSI imposed on other employees as well as Keenon. Under these circumstances, we conclude that the 8.6:1 ratio of punitive damages to compensatory damages in this case is not excessive.
The court in Johnson II also considered the third "guidepost" set forth by the United States Supreme Court in BMW I:
 "The third guidepost stated by the United States Supreme Court in [BMW I] is '[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct.' 517 U.S. at 583, 116 S.Ct. at 1603. The Supreme Court stated that a reviewing court engaged in determining whether a punitive damages award is excessive should ' "accord ' " 'substantial deference' " ' to legislative judgments concerning the appropriate sanctions for the conduct at issue." ' Id., 517 U.S. at 583, 116 S.Ct. at 1603, quoting Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301, 109 S.Ct. 2909, 2934, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part)."
Johnson II, supra, 701 So.2d at 531.
In Johnson II, our Supreme Court noted that the penalties enacted by the legislature for the sort of fraud committed by the defendants in that case were minimal. The court noted that the only real recourse of citizens who were similarly defrauded was by way of litigation. Thus, the court concluded that there was no real basis for comparing legislative sanctions with a meaningful award of punitive damages.
With respect to the third guidepost, the case at hand presents an even more extreme situation than Johnson II. In this case, the only remedy available to Keenon, and others similarly situated, is a civil action pursuant to Ala. Code 1975, § 25-5-11.1. The legislature has proposed no other sanction, civil or criminal, to effectuate the specific purpose of § 25-5-11.1 that employees be able to seek benefits without fear of reprisal. Pate, supra. Accordingly, we conclude that there is no meaningful comparison that can be made between the punitive damages award in this case and other sanctions imposed by the legislature. The absence of any other sanction leads us to conclude that no reduction of the punitive award is warranted under this "guidepost."
After a careful review of the record and a specific application of the three guideposts in BMW I to the particular facts before us, we conclude that the punitive award in this case is not excessive under the law of federal substantive due process. Moreover, we agree with the trial court that a consideration of the other factors articulated in Hammond *Page 486 
and Green Oil, supra, does not require a reduction of the punitive award. Accordingly, the trial court did not err in denying LSI's motion for remittitur.
The judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
YATES, MONROE, and CRAWLEY, JJ., concur.
THOMPSON, J., concurs in the result.