YATES, Presiding Judge.
Yvonnda Stephens[1] sued Thomas W. Allen and his wife, Jean K. Allen, on September 5, 2000, alleging negligence and wantonness and seeking to recover damages for injuries she sustained while on the premises of certain real property owned by the Allens and leased to their son, Fred Allen. The Allens answered on October 24, 2000.
On April 16, 2001, the Allens moved for a summary judgment, which the trial court denied on December 5, 2001. The Allens renewed their motion for a summary judgment on May 10, 2002; the trial court denied the renewed motion for a summary judgment on June 24, 2002.
On June 12, 2001, Stephens amended her complaint to add Fred Allen[2] and his roommate, Jeffrey Cullifer, as defendants. Cullifer did not answer the complaint, and a default judgment was entered against him on November 20, 2001.
The case proceeded to trial against the Alens and their son Fred. At the close of Stephens’s case, the Allens moved for a preverdict judgment as a matter of law (“JML”) as to both the negligence claim and the wantonness claim. The trial court granted the motion as to the wantonness claim, but it denied the motion as to the negligence claim. The Alens renewed their motion for a preverdict JML at the close of all the evidence, which the trial court denied. On October 3, 2002, the jury *1208 returned a verdict in favor of Stephens and against the Allens and Fred in the amount of $15,800. The trial court entered a judgment on the verdict on October 7, 2002. On November 4, 2002, the Allens moved the court for a postverdict JML, or, in the alternative, for a new trial. The trial court denied the Allens’ postjudgment motion on October 19, 2002; the Allens appeal.[3]
The Allens argue on appeal that the trial court erred in denying their motion for a JML. The standard of review for a motion for a JML, under the current version of Rule 50, Ala. R. Civ. P., is the same as the standard for review of a motion for a directed verdict and a motion for a JNOV under Rule 50 as it read before the October 1, 1995, amendment.[4] See Montgomery Coca-Cola Bottling Co., Ltd. v. Golson, 725 So.2d 996 (Ala.Civ.App.1998).
Our supreme court has stated:
“When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11, 1987, the nonmovant must present ‘substantial evidence’ in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Delchamps, Inc. v. Bryant, 738 So.2d 824, 830 (Ala.1999).
The evidence, when viewed in a light most favorable to Stephens, indicates the following: The Allens purchased a house located at 3529 Eighth Avenue South in Birmingham in January 1997. Before purchasing the house, the Allens inspected it and determined that certain repairs needed to be made to the house. The Allens repaired the roof, the gutters, and the back porch, and they also painted the house. The house has a concrete driveway that leads from the street to the rear of the house. The driveway is on a slight upgrade. Approximately halfway up the driveway, and on the right side of the driveway as you face the house from the street,[5] the concrete is cracked and uneven with an elevation change of approximately three to five inches.
The Allens leased the house to their son Fred in February 1997. The crack in the *1209 driveway existed at the time the Allens purchased the house, and the Allens and Fred were aware of the crack at the time they entered into the lease agreement. The term of the lease was from February 1, 1997, to February 1, 1999; Fred was required to pay the Allens $600 per month under the terms of the lease. The lease agreement contained the following provision:
“12. Maintenance and Repair. Lessee will, at his sole expense, keep and maintain the leased premises and appurtenances in good and sanitary condition and repair during the term of this lease and any renewal thereof. In particular, Lessee shall keep the fixtures in the house or on or about the leased premises in good order and repair; keep the furnace clean; keep the electric bells in order; keep the walks free from dirt and debris; and, at his sole expense, shall make all required repairs to the plumbing, range, heating, apparatus, and electric and gas fixtures whenever damage thereto shall have resulted from Lessee’s misuse, waste, or neglect or that of his employee, family, agent, or visitor. Major maintenance and repair of the leased premises, not due to Lessee’s misuse, waste, or neglect or that of his employee, family, agent, or visitor, shall be the responsibility of Lessor or his assigns. Lessee agrees that no signs shall be placed or painting done on or about the leased premises by Lessee or at his direction without the prior written consent of Lessor.”
Jean and Fred both testified at the trial that it was the Allens who were responsible for doing any “major repairs” to the premises. Fred never requested that the driveway be repaired, and the Allens never undertook to repair the driveway. After the term of the lease expired, Fred began leasing the house from the Allens on a “month-to-month” basis.
In May 1999, Cullifer moved into the house with Fred. Fred and Cullifer decided to have a yard sale on May 27, 2000. The items sold in the yard sale belonged to Fred and Cullifer. The Allens sold no property in the yard sale and derived no benefit from it. Fred and Cullifer did not ask the Allens for permission before having the yard sale, and the Allens had no knowledge of the yard sale until approximately seven days after it had occurred. Fred advertised the yard sale by placing an ad in the newspaper and by posting signs in the neighborhood.
Kenneth Tinsley, who was Stephens’s boyfriend at the time, attended the yard sale on the morning of May 27, 2000, and noticed a sofa that he thought Stephens might be interested in purchasing. Tins-ley returned to the yard sale with Stephens in the early afternoon so that Stephens could look at the sofa. Stephens wore clogs with no heel straps to the yard sale. Stephens and Tinsley parked on the street and walked up the left side of the driveway to the rear of the house. Stephens testified that two vehicles were parked in the driveway as they approached the house. The left side of the driveway is relatively smooth and even. The right side of the driveway, which as stated above is cracked and uneven, was obscured from the view of Stephens and Tinsley by the vehicles parked in the driveway. Stephens and Tinsley met Cullifer at the rear of the house, negotiated the purchase of the sofa, and began walking back down the right side of the driveway towards their vehicle. Stephens and Tinsley were escorted down the driveway by Cullifer. Stephens testified that she stepped on the cracked, uneven portion of the driveway and fell, breaking her foot. She stated that she was not looking down; rather, she was looking “straight ahead” when she fell.
*1210 Both Stephens and Tinsley testified that they immediately observed the cracked, uneven portion of the driveway after Stephens fell. Stephens testified that the cracked, uneven portion of the driveway was not obscured by leaves and debris. She further stated that, although the area of the driveway where she fell was covered in the shadows of an automobile and an adjacent tree, those shadows did not hide the condition of the driveway. However, both Stephens and Tinsley stated that the crack in the driveway was not noticeable and that the driveway would have appeared level to someone walking down it from the house toward the street. Photographs contained in the record indicate that the condition of the driveway is readily noticeable to someone viewing the driveway from the street; however, the photographs also indicate that the cracked, uneven portion of the driveway is substantially less noticeable to someone viewing the driveway from the house.
The rule with regard to landlord liability for injuries sustained as a result of defects on the premises owned by the landlord was discussed by our supreme court in Uhlig v. Moore, 265 Ala. 646, 93 So.2d 490 (1957). Our supreme court stated:
“There are two general rules concerning the liability of a landlord in cases of this type. Each is stated in our leading case on this subject, Morgan v. Sheppard, 156 Ala. 408, 47 So. 147, 148 [ (1908) ]. First, the rule as to third persons generally, or strangers, is:
“ ‘... When, however, the premises are out of repair at the time of letting, in particulars which the landlord is bound as regards third persons not to allow, the landlord is liable for injuries sustained by a third person from such want of repair. The reason for the rule seems to be that in such a case the dangerous condition of the premises constitutes a nuisance, and the liability of the landlord results from his leasing premises upon which a nuisance exists.... ’
“This rule does not apply as to the tenant, his servants, guests, or others entering under his title. As to them, in the absence of a covenant to repair, or keep in repair, the landlord is only liable for injuries resulting from latent defects, known to him at the time of the leasing, and which he conceals from the tenant. Morgan v. Sheppard, supra.”
Uhlig, 265 Ala. at 649, 93 So.2d at 492. The supreme court has further commented on the applicable law as follows:
“In Anderson v. Robinson[, 182 Ala. 615, 62 So. 512 (1913),] this court stated:
“ ‘In the case of Morgan v. Sheppard, 156 Ala. 403, 47 So. 147 [ (1908) ], this court by the present writer, discussed the obligation and liability between landlord and tenant, their duties and liability to each other as well as to third persons, and it was there stated, among other things, in speaking of the liability of a landlord for injuries caused by defects in the premises to the tenant, his family, servants, or guests, as distinguished from third persons: “The rule, however, of the liability of the landlord for renting premises in such a dangerous condition as to constitute a nuisance, does not exist in favor of the tenant, his servants, guests, or others entering under his title.... As to them, in the absence of a covenant to repair, he is only liable for injuries resulting from latent defects, known to him at the time of the leasing, and which he conceals from the tenant.... If the defect is obvious at the time of the letting, the tenant takes possession of the premises as he found them, and the landlord would not be liable for *1211 injuries resulting from said obvious defects to the tenant, his family, servants, or guests.” It may be true that in stating the rule we were overcautious in confining it to cases in which there was no covenant to repair, but we did not hold that such a covenant would change the rule of liability, and expressly pretermitted the question further on in the opinion in dealing with count four of the complaint in said case. In the case at bar, however, some of the counts set up a covenant to repair when the lease was made and as a part of the consideration of same, but it seems from the great weight of authority that said covenant does not increase the liability of the landlord or change the rule above set forth as to his liability in tort to the tenant, his family, servants, or guests for injuries caused by virtue of defects in the rented premises. In other words, it seems settled by the weight of authority that the landlord is not liable in tort for injuries to said class, whether there be a covenant to repair or not, unless the defects existed at the time of the letting, were known to him, and which he concealed from the tenant.... ’
“... Anderson extended Morgan to hold that a landlord cannot be liable to a tenant, his family, servants or guests for injuries caused by virtue of defects in the rented premises unless the defects were in existence at the time of the letting, were known to the landlord, and concealed from the tenant.”
Cohran v. Boothby Realty Co., 379 So.2d 561, 563-64 (Ala.1980).
The caselaw clearly creates two potential classes of plaintiffs and corresponding duties of the landowner to those classes of plaintiffs: (1) a landowner will be liable to third persons or strangers injured upon the premises by a defect that existed at the time of the lease;, and (2) a landowner will be liable to the “tenant, his servants, guests, or others entering under [the tenant’s] title” for injuries caused by latent defects existing on the premises at the time of leasing that are known to the landlord and that he conceals from the tenant. Uhlig, 265 Ala. at 649, 93 So.2d at 492. Accordingly, the inquiry to be made is whether Stephens was a “third person” or “stranger” upon the land owned by the Allens and leased to Fred on the day of the incident, or whether she was a “servant, guest, or other” entering the premises under Fred’s title on the day she was injured.
Relying upon Great Atlantic & Pacific Tea Co. v. Traylor, 239 Ala. 497, 195 So. 724 (1940), Stephens argues that because she had never previously been on the premises where the incident occurred she was a “stranger” or “third person” and that the Allens were liable to her because they leased the premises to Fred with the driveway being in a state of disrepair. Stephens’s reliance upon Traylor is misplaced. In Traylor, Great Atlantic & Pacific Tea Co. (“Great Atlantic”) owned a building in which it operated a grocery store. Great Atlantic leased a portion of the building to a tenant for use as a meat market. Great Atlantic and the owner of the meat market had no business affiliation and shared no financial interests. Great Atlantic owned a sign advertising its business, which extended across the sidewalk. Great Atlantic agreed to allow the tenant to attach a sign advertising the meat market to the bottom of its sign advertising the grocery store. A pedestrian walking along the sidewalk was injured when the tenant’s meat market sign fell. The evidence indicated that the sign fell because the frame on Great Atlantic’s grocery sign, to which the meat market sign was attached, had partially decayed. Ap *1212 plying the rale that a landlord will be liable to a third person for injuries suffered that were caused by dangerous conditions existing upon the premises at the time of the lease, our supreme court affirmed a judgment in favor of the pedestrian and against Great Atlantic. Traylor, supra. In overruling Great Atlantic’s application for a rehearing, the supreme court stated:
“The case of Morgan v. Sheppard, 156 Ala. 403, 407, 47 So. 147 [ (1908) ], brings out clearly the distinction in the duty of a landlord to the tenant, his family, employees and customers on the one hand, and to strangers to them both on the other. And so do the authorities generally hold. Liability to the tenant and his privies is on one principle ... and to strangers on another.”
Traylor, 239 Ala. at 501, 195 So. at 727. The supreme court apparently treated the pedestrian walking along the sidewalk as a stranger or third person because he was not the tenant’s family member, employee, or customer, and it concluded that Great Atlantic was liable to him because the premises contained a dangerous condition at the time it was leased to the tenant. Traylor, supra.
Unlike the pedestrian in Traylor, Stephens was a customer or business invitee of Fred’s because she was on the premises to confer a material and commercial benefit upon him, i.e., she attended a yard sale to inquire about and ultimately purchase a sofa from Fred. See Ex parte Mountain Top Indoor Flea Market, Inc., 699 So.2d 158 (Ala.1997). Therefore, she entered the premises under Fred’s title and the Allens can be liable to her only for her injuries resulting from latent defects that were known to them at the time of the leasing and that they concealed from Fred. Uhlig, supra. The evidence indicates that both the Allens and Fred were aware of the condition of the driveway at the time they entered into the lease agreement. No evidence was presented that indicates that the Allens endeavored to conceal the condition of the driveway from Fred at the time of the lease. Accordingly, we conclude that the trial court erred in not granting the Allens’ motion for a JML. We therefore reverse the judgment and remand the case for the trial court to enter a judgment consistent with this opinion.
REVERSED AND REMANDED.
CRAWLEY, THOMPSON, PITTMAN, and MURDOCK, JJ., concur.

. At the time the incident giving rise to the complaint occurred, Stephens was unmarried. Stephens later married Kenneth Tins-ley, a witness to the incident, and changed her name to Yvonnda Stephens Tinsley. Because the pleadings and the notice of appeal use Stephens's maiden name, we will refer to her as "Stephens.”

. Fred Allen elected to proceed pro se.

. Fred Allen is not a party to this appeal.

. That October 1, 1995, amendment to Rule 50 changed the terminology relating to what had been known as a "motion for a directed verdict” and a "motion for a judgment notwithstanding the verdict.”

.References to the right side or the left side of the driveway will be made as if the reader is standing in the street and facing the house.