**Larry DANIELS and Gloria Daniels, husband and wife, Appellants (Plaintiffs below),**

v.

**BIG HORN FEDERAL SAVINGS AND LOAN ASSOCIATION, a Wyoming Corporation, Appellee (One of Defendants below).**

**No. 5167.**

Supreme Court of Wyoming.

Jan. 10, 1980.

John W. Davis, of Davis, Donnell & Worrall, Worland, for appellants.

Richard E. Day, of Williams, Porter, Day & Neville, P. C., Casper, and Gary P. Hartman, Greybull, for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROSE, Justice.

The issue in this appeal is whether plaintiffs-appellants, Larry and Gloria Daniels, presented a sufficient case to the trial court for it to find that defendant-appellee, Big Horn Federal Savings and Loan Association, was liable for negligent disbursement of construction-loan proceeds borrowed by the Danielses. This appeal involves no factual disputes. Appellants' sole contention is that the facts of this case, even when conflicts are resolved in favor of Big Horn, establish liability on the part of Big Horn.

The Savings and Loan Association correctly conceded at trial that it was chargeable with exercising due care in looking after the Danielses' interest when disbursing their funds. The trial judge found that Big Horn had exercised due care and awarded judgment in its favor. Thus, the issue on appeal becomes this: How much care did the Savings and Loan Association owe to the Danielses and, under the facts of record, was its duty of care discharged? We will affirm the trial judge on the ground that Big Horn did exercise whatever care with which it could, in law, be chargeable.

### THE FACTS

In the summer of 1977, the Danielses, for the sum of $38,500.00, contracted with one Jerry Wood to build a house in Thermopolis, Wyoming, on a lot provided by the Danielses. Mr. and Mrs. Daniels arranged with Big Horn for a construction loan of $33,000.00, contemplating that they would utilize $18,000.00 of their own money with which to purchase a $12,300.00 lot and make an initial payment to the contractor. (Although the contract called for a 20% initial payment, the contractor agreed to accept $5,000.00.)

Big Horn became involved as a lender on October 6, 1977, and at that time made a controversial disbursement. By that date, construction on the house had progressed to the point where 45% of the contract price—the 20% initial payment and a 25% progress payment—minus the $5,000.00 already paid, was owed the contractor by the Danielses under the contract between these parties. By that time some disturbing things had happened. Mr. Daniels had discovered that three subcontractors or materialmen were threatening liens on the property; Kay O'Leary, manager of the Thermopolis branch of Big Horn, had received a call from one George Bower, a director of Big Horn and a Worland "customer" of Wood, wherein she was advised to be careful about the loan because Bower had doubts about Wood's financial and building abilities. Ms. O'Leary was aware that Wood owed money in Worland and correctly surmised that he would use some of the loan-disbursement proceeds to pay off his Worland obligations. She also knew that Wood was to receive a final payment on a Worland project when he settled the remaining debts incurred while building that project.

Before making any disbursements on October 6, 1977, Ms. O'Leary met with Larry Daniels. It was Ms. O'Leary's suggestion that Wood be required to present her with a list of all debts owed on the Danielses' house. Checks, jointly payable to Wood and his creditors, would then be issued in payment of these debts. In addition, Ms. O'Leary proposed retaining 10% of the 25% progress payment which was due. This 10% "retainage," as well as the final payment due upon completion, would be withheld pending receipt of lien waivers.

Mr. Daniels agreed to both of these measures and to the loan disbursements that were actually made. The trial judge found that Mr. Daniels had signed an acknowledgement of receipt of a list of the disbursements before the disbursements were made.

On October 6, 1977, Big Horn disbursed $3,961.19 in the form of joint checks to Wood and his creditors and $11,379.00 to Wood only. This last-mentioned disbursement to Wood appears to be the only payment that the Danielses specifically complain about. O'Leary testified that she arrived at the $11,379.00 figure due Wood by computing 45% of the contract price and then subtracting $5,000.00, as well as 10% of the 25% progress payment. The Danielses have not alleged that it was negligent of O'Leary to fail to subtract the $3,961.19 paid Wood's creditors from the $11,379.00 that was calculated to be due Wood. Accordingly, we will consider the disbursements as having been made within the framework of the contract schedule and with the Danielses' consent.

Several weeks later, Wood walked off the job leaving an unfinished house and unpaid bills. Another builder was hired to complete the work, the bills were paid, and the structure wound up costing the Danielses about $60,000.00. (The trial court did

award the Danielses a judgment of approximately $23,000.00 against Wood. However, the strong implication is that this judgment represents only a symbolic victory.)

The record shows that the $3,961.19 paid jointly to Wood and his creditors on October 6 failed to extinguish all of Wood's liability existing at that date on the Danielses' house.

At trial there was uncontradicted expert testimony to the effect that: (1) It was uncommon in Wyoming at that time to obtain lien waivers from a contractor before the project was completed; and (2) contractors usually kept only one account out of which they paid bills due on various projects and into which they put money received from various projects.

### Appellants' Contentions

The Danielses recognize that part of the difference between the bid price of the house and the ultimate cost comes about by reason of the fact that Wood underbid the house, which underbid they estimate to be $5,000.00. After allowing for this, they calculate that they suffered a "loss" of $17,994.58 on the construction of the house and argue that "Big Horn Federal should have been assigned the burden of proving that the remaining $17,994.58 of the Daniels' [sic] loss actually went into the Daniels' [sic] house." [1]

### The Law

The litigants do not cite us, nor have we found, any Wyoming cases the subject of which is a claim by a borrower that a construction lender made a negligent disbursement of proceeds to the contractor.

Many courts conclude that when the lender insists on making the disbursements, it is obligated to take some steps to protect the borrower's interest along with its own.

The Supreme Court of Alaska, in *Fikes v. First Federal Savings and Loan Association of Anchorage*, Alaska, 533 P.2d 251, 261 (1975), quotes with approval language in a New Jersey decision:

" '[W]e think plain principles of equity at least call for . . . a construction lender to make and administer the loan in the conventional manner of a construction lender rather than mask what is essentially a loan on the general credit and reliability of the borrower and the security of the land value as a construction loan, and act accordingly in disbursing the funds.' " (From *Cambridge Acceptance Corporation v. Hockstein*, 102 N.J.Super. 435, 246 A.2d 138, 141 (App. Div.1968).)

Addressing a case of first impression in Indiana, a court of appeals there concluded:

". . . A mortgagee-lender who insists on controlling disbursement of the loan proceeds in order to protect its own interests (mortgage lien), deprives the mortgagor of possession of the loan proceeds for which he has bargained, and in doing so must equitably be considered as the mortgagor's agent saddled with a duty to use reasonable care to protect the principal's interests. . . ." *(Prudential Ins. Co. of America v. Executive Estates*, Ind.App., 369 N.E.2d 1117, 1128 (1977), rehearing denied 1978).

A Louisiana court held that a bank which made a construction loan and undertook to disburse the money was a "fiduciary and agent" of the borrower. *Bollinger v. Livingston State Bank and Trust Co.*, La.App., 187 So.2d 784, 787 (1966).

Recently the Supreme Court of Mississippi, in reversing a summary judgment, said that a construction lender "should have used reasonable diligence to see that the funds were actually used in payment of materials or other costs of construction." *Cook v. Citizens Savings and Loan Associa-*

---

1. This appears to contradict our statement, supra, that the Danielses are only charging Big Horn with negligence with respect to the October 6 disbursement of $11,379.00 to Wood. However, appellants call the October 6 disbursement the central event. In their brief, they do not complain of other disbursements. They appear to assume in their statement of facts that the $3,961.19 disbursement jointly to Wood and his creditors "went into" the Danielses' house.

*tion*, Miss., 346 So.2d 370, 372 (1977), citing *Southern Life Insurance Co. v. Pollard Appliance Co.*, 247 Miss. 211, 150 So.2d 416 (1963).

The Supreme Court of Minnesota has held that when a mortgagee undertakes to disburse funds for a mortgagor under a construction contract, a fiduciary relationship arises. *M.S.M. Corporation v. Knutson Company*, 283 Minn. 527, 167 N.W.2d 66, 68 (1969).

Other courts have, however, taken a contrary position.

The Supreme Court of Ohio recently held that the mere fact of a mortgagor-mortgagee relationship involving a construction loan does not make the mortgagee liable as the mortgagor's agent. *Gardner Plumbing, Inc. v. Cottrill*, 44 Ohio St.2d 111, 338 N.E.2d 757, 760 (1975). In a case very similar to the one at Bar, the court held that the mortgagor's endorsement of the bank's disbursals relieved the bank of any duty to insure that the subcontractors, materialmen and workers had been paid by the contractor.

The Texas Court of Civil Appeals declined to find a fiduciary relationship between a mortgagor and a mortgagee as a result of the latter's financing construction. *Linder v. Citizens State Bank of Malakoff, Texas*, 528 S.W.2d 90, 94 (Tex.Civ.App. 1975), rehearing denied 1975.

A Florida court held that the lender owes no duty to supervise the construction and development of projects which it finances. *Armetta v. Clevetrust Realty Investors*, Fla.App., 359 So.2d 540, 543 (1978), rehearing denied 1978.

A Tennessee decision holds for the proposition that a lender is under no obligation to protect against liens when disbursing construction-loan proceeds to a contractor. *Goodner v. Lawson*, 33 Tenn.App. 676, 232 S.W.2d 587, 591 (1950).

Assuming, arguendo, that the lender who controls disbursement of construction-loan funds is obligated to do something more than merely protect its own interest, it becomes necessary to determine the extent of the lender's duty of care to the borrower.

Even the cases collected above which contain statements to the effect that the lender owes a duty of care to the borrower do not appear to help the Danielses. Most of the cases are not directly in point. The Louisiana court which held the lender to be a "fiduciary and agent" of the borrower limited the fiduciary duty to disbursing the funds according to the contract schedule and did not consider the bank obligated to insure that there were no outstanding liens on the project when it was finished. *Bollinger*, supra, at 187 So.2d 787.

Appellants place great reliance on a decision of an Ohio appeals court. *Falls Lumber Co. v. Heman*, 114 Ohio App. 262, 181 N.E.2d 713 (1961).[2] In that case, the construction lender was held liable for lien claims against the mortgagors because the lender promised the mortgagors that it "would take care of things" for them. Id. 181 N.E.2d at 714. The fact of the lender's promise is highly significant under Ohio law in view of *Gardner Plumbing*, supra. In his memorandum letter, the trial judge specifically noted that Big Horn had not assumed any duty of care to the Danielses as a result of a written or oral agreement. But even if we assume, arguendo, that the bare relationship of borrower and construction lender between the Danielses and Big Horn obligated Big Horn "to take care of things" for the Danielses, it is not at all clear that *Falls Lumber* comes to the rescue of the Danielses. In *Falls Lumber* the lender failed to get the "construction company to submit releases under the mechanic's lien law of Ohio." Id. 181 N.E.2d at 714. In the instant case, the evidence is that Big Horn did intend to get lien waivers before releasing the final payment to Wood, which final payment had presumably been increased in size because of the ten percent "retainage." The evidence in this case is

---

**2.** The trial court's opinion in this case is reported in a later volume of the reporter: 183 N.E.2d at 265 (Ohio Com.Pl.1960).

also to the effect that it is unusual for a Wyoming lender to obtain lien waivers before the project is completed. In *Falls Lumber*, unlike the instant case, the construction lender failed to fulfill a clearly recognized "due-care" obligation.

From our review of the above authorities, we are unable to agree with the appellants that they have proven liability on the part of Big Horn for negligent disbursement. Nor have they persuaded us that if the borrower establishes a loss on a construction project, it becomes the construction lender's burden to prove that it exercised due care. The appellants have failed to convince us or the trial court that the record proves that Big Horn was negligent—in any manner pointed out by the appellants—with respect to safeguarding the Danielses' interest. In other words, they have failed to show what duty of care Big Horn owed the Danielses which duty the Savings and Loan Company failed to discharge.

Affirmed.