773 So.2d 1039 (1999)
Larry D. COOLEY and Marcia Cooley
v.
GULF BANK, INC.
Gulf Bank, Inc.
v.
Larry D. Cooley and Marcia Cooley.
2970805.
Court of Civil Appeals of Alabama.
August 20, 1999.
Rehearing Denied October 15, 1999.
*1040 David J. Thies of Murchison & Sutley, L.L.C., Foley, for appellants/cross appellees Larry D. Cooley and Marcia Cooley.
Thomas M. Galloway, Jr., of Galloway, Smith, Wettermark & Everest, L.L.P., Mobile, for appellee/cross appellant Gulf Bank, Inc.
YATES, Judge.
In January 1995, Larry D. Cooley and Marcia Cooley, husband and wife, sued Gulf Bank, Inc., and two of Gulf Bank's employees, M.E. Costigan and Kim S. McConnell, alleging a breach of contract, negligence, wantonness, negligent supervision, and fraudulent misrepresentation in regard to a construction-loan contract. (By stipulation, both Costigan and McConnell were dismissed as defendants, before trial.) In February 1996, the Cooleys moved to consolidate their lawsuit against Gulf Bank with a pending lawsuit against the building contractor, Ogletree Builders, Inc., and its owner, Charles Ogletree, because both cases involved the same dispute regarding negligent financial practices alleged to have been committed in regard to the construction of the Cooleys' residence. Gulf Bank moved for a summary judgment as to all counts; the court entered a summary judgment for Gulf Bank on the negligence, wantonness, and negligent-supervision claims, and on the fraudulent-misrepresentation claim insofar as it might relate to promissory fraud.
The breach-of-contract claim and the fraudulent-misrepresentation claim (aside from its promissory-fraud aspects) were tried before a jury. At the close of the Cooleys' case, the trial court directed a verdict (now known as a judgment as a matter of law ("JML"), see Rule 50, Ala. R. Civ. P.) in favor of Gulf Bank on the misrepresentation claim. On the breach-of-contract claim, the jury returned a *1041 $23,614 verdict against Gulf Bank and a $75,000 verdict against Charles Ogletree.
The Cooleys appeal, arguing that the court erred: (1) in entering a summary judgment in favor of Gulf Bank on their negligence, wantonness, and promissory-fraud claims; (2) in directing a verdict in favor of Gulf Bank on their misrepresentation claim; and (3) in instructing the jury as to damages for mental anguish regarding their breach-of-contract claim. Gulf Bank cross-appeals, arguing that the court erred in denying it a JML as to the breach-of-contract claim. This case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala.Code 1975.

Summary Judgment
A summary judgment is proper when there exists no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P.; Chatham v. CSX Transp., Inc., 613 So.2d 341, 343 (Ala. 1993). In considering a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmovant and resolve all reasonable doubts concerning the existence of a genuine issue of material fact against the moving party. Fincher v. Robinson Bros. Lincoln-Mercury, Inc., 583 So.2d 256 (Ala. 1991). Once the moving party makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present evidence creating a genuine issue of material fact. Chatham, supra, at 343. The nonmovant must meet this burden by presenting "substantial evidence," i.e., "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
The undisputed facts are that the Cooleys contracted with Ogletree Builders, Inc., around 1991 to build a residence, for approximately $163,200. Larry Cooley was referred by Charles Ogletree to Kim McConnell, a loan officer for Gulf Bank, to obtain a construction loan. Larry Cooley entered a contract with Gulf Bank to finance the building project. One of the conditions of the loan was that Gulf Bank would oversee the building project by completing inspections and providing the advances or "draws," based on a draw schedule prepared by the bank. Specifically, Larry Cooley requested of McConnell that someone "ensure that the amount of draws [is] consistent with the amount of building going up because [he said he knew] nothing about building and estimating this sort of thing." Larry Cooley further asserted that McConnell assured him that Gulf Bank would "take care of it."
There was disputed testimony as to the accuracy of the draw schedule prepared by McConnell, as well as to who had authorized each draw. Mr. Cooley testified that he was residing in Maryland throughout the initial building phase and that he did not have the knowledge or expertise to authorize a draw to Ogletree Builders. Rather, Mr. Cooley said, he would receive a telephone call from McConnell in which McConnell would state that she had inspected the construction site and that, based on her assessment, a draw should be authorized. Any approval provided by Mr. Cooley was based on the representations made by McConnell. In addition, both Mr. Cooley and McConnell testified that a draw schedule was not prepared at the time the contract was signed with Gulf Bank, and McConnell further asserted that she had concerns with the draw schedule, because, she said, it was not made on the appropriate form for that particular kind of construction project. McConnell, who personally made each inspection and prepared each draw, stated that although it would have been improper to do so, she could not recall if she had provided Ogletree with advances/draws before her actual inspections were completed. Additionally, she indicated that several dates on the *1042 forms could have been incorrect and that there was no way to know if the percentages were based on actual work completed by the time each draw was provided to Ogletree Builders.
M.E. Costigan, McConnell's supervisor, substantiated McConnell's testimony that the bank had agreed to inspect and approve each draw before it was disbursed to Ogletree Builders and McConnell's testimony that the draw schedule did not accurately reflect the percentages for work completed. When questioned about whether the bank had erred in advancing Ogletree Builders payment for work not completed according to the draw schedule, Costigan admitted that he did not know.
In addition, the Cooleys provided a banking consultant, Don Coker, who testified, as an expert witness, that after reviewing the bank documents, the draw schedule, and invoices from suppliers of building materials, he noted inconsistencies regarding the dates that items were paid for versus the dates the work was actually completed. He further opined that the draw schedule was inadequate for the kind of construction job being performed. He concluded that it was improper to provide a check directly to the contractor without requiring that the check be endorsed by both the contractor and subcontractors to ensure that all parties received payment. There was testimony indicating that Charles Ogletree had failed to pay several suppliers and that this failure had caused the Cooleys to have to secure an additional $23,000 from the bank in order to continue the construction. Coker also stated that, in his opinion, Gulf Bank had breached the terms of the contract regarding its responsibility to perform inspections before authorizing an advance to the builder, and that in his opinion the actions of the bank did not conform with standard banking practices.
Charles Ogletree also testified that there were discrepancies in the dates of completion shown on the draw schedule as compared to the invoices showing the dates materials were supplied. He further admitted that by the time of the third draw his company had received at least $29,000 more in draws from Gulf Bank than had been paid out as expenses.
Clearly, based on substantial evidence submitted in this case, the jury could have concluded that the Cooleys did incur actual damage as a result of negligence and wantonness on the part of the bank. Further, although there was evidence indicating that the increase in the construction loan was caused by the builder's failure to pay suppliers and indicating that Charles Ogletree had underestimated the cost of the project, it is equally plausible that the additional costs incurred by the Cooleys were the direct result of inappropriate draws made to Ogletree Builders without proper inspections and that they were based on inaccurate recordings of the completion percentages, as admitted by Gulf Bank and corroborated by the expert testimony. In any event, because the Cooleys presented substantial evidence, their claims should have been presented to the jury. We reverse the summary judgment for Gulf Bank on the negligence and wantonness claims.
As to the promissory-fraud-claim, we conclude that the Cooleys did not meet the fifth element of a promissory-fraud cause of actionthat at the time of the alleged misrepresentation, Gulf Bank had an intent to deceive and not to perform the promised act. To prove promissory fraud, a plaintiff must show: (1) a misrepresentation (2) of a material existing fact, (3) upon which the plaintiff relied,[1] (4) that proximately caused damage to the plaintiff, and *1043 (5) that at the time of the alleged misrepresentation, the defendant had the intent to deceive and not to perform the promised act. Pinyan v. Community Bank, 644 So.2d 919, 923 (Ala.1994); Johnston v. Green Mountain, Inc. 623 So.2d 1116, 1121 (Ala.1993). We affirm the summary judgment as to the promissory-fraud claim.

The Directed Verdict
Rule 50, Ala. R. Civ. P., as amended effective October 1, 1995, renamed the "motion for a directed verdict" and the "motion for a judgment notwithstanding the verdict" as a "motion for a judgment as a matter of law" and a "renewal of the motion for a judgment as a matter of law," respectively. The standard of review for a motion for a judgment as a matter of law is the same as for a motion for a directed verdict and a motion for JNOV. See Montgomery Coca-Cola Bottling Co., Ltd. v. Golson, 725 So.2d 996 (Ala.Civ.App.1998).
Our supreme court has stated:
"When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11, 1987, the nonmovant must present `substantial evidence' in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992)."
Delchamps, Inc. v. Bryant, 738 So.2d 824 (Ala.1999).
The elements of a misrepresentation claim, regardless of whether the misrepresentation is alleged to have been made willfully, recklessly, or mistakenly, see § 6-5-101, Ala.Code 1975, are (1) a false representation (2) of a material existing fact (3) on which the plaintiff relied (4) that proximately resulted in damage to the plaintiff. See George v. Associated Doctors Health & Life Ins. Co., 675 So.2d 860, 862 (Ala.1996). The Cooleys presented evidence indicating that although Gulf Bank had promised to disburse funds based on the draw schedule, physical inspections, and the percentage of work completed, Gulf Bank admitted to providing Ogletree Builders with draws before the work was completed and without properly documented inspections. Because the Cooleys presented substantial evidence in support of their misrepresentation claim, that claim should have been submitted to the jury. Reviewing the evidence in a light most favorable to the Cooleys, we conclude that the jury could have found that the additional costs incurred by the Cooleys represented actual damage incurred as a result of the actions of Gulf Bank, or, in the alternative, that the Cooleys were entitled to at least nominal damages for the admitted misrepresentations by Gulf Bank. See LaCoste v. SCI Alabama Funeral Services, Inc., 689 So.2d 76 (Ala.Civ.App. 1996). Insofar as it relates to the misrepresentation claim, the judgment is reversed.

The Jury Verdict
The Cooleys argue that the trial court erred in failing to instruct the jury *1044 that it could award damages for mental anguish if it found in favor of the Cooleys on the breach-of-contract claim. We agree. The Cooleys presented substantial evidence of a breach of contract, and the jury awarded them $23,614 from Gulf Bank. The jury verdict has not been shown to be improper, given the presumption of correctness afforded a jury verdict. Valley Properties, Inc. v. Strahan, 565 So.2d 571 (Ala.1990); Life Ins. Co. of Georgia v. Smith, 719 So.2d 797 (Ala.1998). However, because the jury found in favor of the Cooleys on their breach-of-contract claim, the jury should have been allowed to consider an exception to the rule relating to damages for mental suffering or anguish, as requested by the Cooleys. See Sexton v. St. Clair Federal Sav. Bank, 653 So.2d 959, 961 (Ala.1995) (supreme court upheld award of damages for mental anguish in a breach-of-contract action, as an "exception based on a `contractual duty' that is `coupled with matters of mental concern or solicitude' ... in situations involving contracts relating to a plaintiff's current residence"). See also, Talent Tree Personnel Serv., Inc. v. Fleenor, 703 So.2d 917 (Ala. 1997). The trial court erred in not instructing the jury that it could award damages for mental anguish on the breach-of-contract claim.
As to Gulf Bank's cross appeal, we conclude that the court properly denied Gulf Bank's motion for a directed verdict. The Cooleys submitted substantial evidence to support their breach-of-contract claim.
The judgment is affirmed in part and reversed in part, and the case is remanded for a new trial.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR A NEW TRIAL.
ROBERTSON, P.J., and MONROE, J., concur in the result.
CRAWLEY and THOMPSON, JJ., concur in part and dissent in part.
CRAWLEY, Judge, concurring in part and dissenting in part.
I concur in the affirmance of the summary judgment as to the promissory-fraud claim. I dissent, however, from the reversal as to the remaining claims. I would affirm the judgment as to the negligence, wantonness, and misrepresentation claims. As to the judgment entered on the jury verdict on the breach-of-contract claim, I would affirm as to the finding of the Bank's liability but reverse as to the award of damages.
The Cooleys' argument regarding the Bank's liability is the same for all their claims; namely, that the Bank erred by advancing payments to Ogletree for work he had not completed according to the draw schedule. Judge Yates's opinion for the court concludes that the Cooleys presented substantial evidence supporting their theory of the case and that they were entitled, therefore, to have a jury decide their claims. I agree that the Cooleys did, for most of their claims, present substantial evidence indicating that the bank breached a duty to themeither a tort duty or a duty imposed by contract. However, I disagree with the conclusion that the Cooleys presented substantial evidenceor, in fact, any evidenceindicating that the Bank's alleged breach of duty was the proximate cause of the damage the Cooleys suffered.
"A proximate cause issue is ordinarily a question of fact to be determined by a jury. It becomes a question of law, however, when `there is a total lack of evidence from which the factfinder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury.' Davison [v. Mobile Infirmary], 456 So.2d [14] at 24 [(Ala. 1984)]."
Green v. Alabama Power Co., 597 So.2d 1325, 1327-28 (Ala.1992).

I. The Tort Claims

Judge Yates's opinion makes much of the fact that the Cooleys' expert testified, *1045 and the Bank employees acknowledged, that the Bank's form for the draw schedule was "inadequate" for the kind of construction work Ogletree performed for the Cooleys. That testimony was a red herring and may have been used at trial to throw the jury off track. The "inadequacy" referred to is the fact that the form based the draw schedule on a residence with a conventional foundation, whereas the Cooleys' house on Ono Island was built on pilings. Ms. McConnell testified that she inspected the construction site before the first draw and checked off, on the draw-schedule form, that the foundation was complete when, in fact, the house had no foundation. Judge Yates's opinion for the court fails to recount McConnell's further testimony that, although the house had no foundation, the support system it did have (the pilings) was complete by the time of the first draw.
Ogletree, the builder, received three drawsin April, May, and July 1993. At the time of the first draw, the Bank estimated that the construction was 22% complete; it paid Ogletree accordingly. At the time of the second draw, the Bank estimated that the project was 35% complete, and it gave Ogletree a draw representing the same percentage. At the third draw, the Bank estimated that the work was 48% complete, and it paid Ogletree that percentage of the contract price. At trial, Mr. Cooley testified that he did not dispute the Bank's assessment of the percentage of the work completed before any of the draws. Although Mr. Cooley was, as Judge Yates's opinion for the court states, in Maryland during the initial phase of the construction, he was back in Alabama and was physically present at the construction site at the time of each draw. The Bank sought and received Mr. Cooley's approval before giving Ogletree each draw.
The purpose for requiring that a builder's draws be commensurate with the percentage of the work completed is to maximize the builder's incentive to stay on the job until it is complete and to minimize the builder's temptation to abscond with any excess funds. See, e.g., Sexton v. St. Clair Federal Sav. Bank, 653 So.2d 959 (Ala. 1995). That purpose was served here, and the Cooleys presented no evidence to the contrary.
The Cooleys' problems began after the third draw. At that time, Mr. Cooley learned that Ogletree had not paid a supplier for approximately $20,000 worth of materials used in the house. Cooley then met with loan officials at the Bank and determined that Ogletree had approximately $23,000 worth of unpaid invoices from subcontractors and suppliers. The parties decided that, until the project was complete, the Bank would pay subcontractors and suppliers directly. The Bank did not continue to pay Ogletree after it learned of the problem. Instead, it took immediate action to remedy the problem and to prevent it from recurring.
After the third draw, approximately $80,000or 52%of the loan proceeds remained. Significantly, 52% of the work also remained to be done. However, in response to a request from the Bank, Ogletree calculated that it would cost $98,000 to complete the project. Because it appeared that there would be a shortfall of $18,000 in loan proceeds necessary to finish the job, the Cooleys refinanced their construction loan and increased the amount of their indebtedness to the Bank by $20,000. Mr. Cooley testified that he paid $3,693 in interest on the additional loan, for a total new indebtedness of $23,693. In fact, the cost to complete the project was not $98,000, but $124,000. The residence Ogletree had contracted to build for $163,200 ended up costing $206,675.
The theory on which the Cooleys based their negligence, wantonness, and misrepresentation claims was that, although the Bank had a duty to disburse funds to the builder only after physically inspecting the property and determining that the percentage of work completed was commensurate *1046 with the draw requested, the Bank's site inspections were faulty and, in one instance, occurred after the builder had already received a draw for the work being inspected. Specifically, the Cooleys relied on the following irregularities in the Bank's inspections to show negligence, wantonness, and misrepresentation: (1) the April inspection indicated that termite treatment and concrete work had been completed when, the Cooleys claim, neither had been done; (2) the July inspection indicated that the plumbing and electrical rough-ins had been completed when, the Cooleys claim, neither had been done; and (3) the builder was given his third draw before the Bank made the third site inspection.
The Bank presented evidence refuting each of the Cooleys' claimed irregularities. Clearly, then, the question whether the Bank breached a tort duty to the Cooleys was disputed. What was not disputed, however, was whether the alleged breach proximately resulted in damage to the Cooleys.
The Cooleys presented evidence indicating that they spent $67,168 more for the construction of their home than they had initially contracted for: $23,693 in additional indebtedness to the Bank after they refinanced their loan; and $43,475 in cost overruns on their contract with Ogletree (the difference between the final cost of $206,675 and the original contract price of $163,200). However, they presented no evidence indicating that either of those amounts was attributable to a breach of the Bank's duty to inspect.
Even assuming that the Bank's inspection reports were faulty because they indicated that certain work was complete when, in fact, it was incomplete, the Cooleys failed to show that the faulty inspection reports resulted in any damage to them. Although Mr. Cooley challenged the accuracy of specific sections of the inspection reportssuch as whether the termite treatment, or the concrete, electrical, and plumbing work had been performed when the Bank indicated that it was performedhe admitted that the Bank's assessment of the percentage of the work completed before each draw was accurate and that he approved each draw. The Cooleys presented no evidence to indicate that, if the inspection reports had been more precise, they would not have been required to increase their loan indebtedness to the Bank or to pay for cost overruns on their contract with Ogletree.
The evidence was undisputed that the $23,693 increase in the construction loan from the Bank was to cover the cost of Ogletree's failure to pay his suppliers. In support of its holding that the Cooleys presented substantial evidence indicating that the Bank's actions proximately caused their loss, Judge Yates cites the following testimony from the Cooleys' expert, a banking consultant:
"It was improper to provide a check directly to the contractor without requiring that the check be endorsed by both the contractor and subcontractors to ensure that all parties received payment."
See 773 So.2d at 1042. With all due respect to Judge Yates and to the Cooleys' banking consultant, I point out that the foregoing testimony does not correctly state the law with respect to the duty of a construction lender.
Although the issue has not been addressed in Alabama, the general rule is that, in the absence of an obligation imposed by contract, a construction lender has no duty to see that a general contractor has paid his subcontractors and suppliers before the lender disburses loan proceeds to the general contractor See, e.g., Construction Lender, Inc. v. Sutter, 228 Ga.App. 405, 491 S.E.2d 853 (1997); Spurlock v. Fayette Federal Sav. & Loan Ass'n, 436 N.E.2d 811 (Ind.App.1982); Bollinger v. Livingston State Bank & Trust Co., 187 So.2d 784 (La.App.1966); First Nat'l State Bank of New Jersey v. Carlyle House, Inc., 102 N.J.Super. 300, 246 A.2d 22 (1968), aff'd, 107 N.J.Super. 389, 258 A.2d *1047 545 (1969), cert. denied, 55 N.J. 316, 261 A.2d 359 (1970); Gardner Plumbing, Inc. v. Cottrill, 44 Ohio St.2d 111, 338 N.E.2d 757 (1975); Goodner v. Lawson, 33 Tenn. App. 676, 232 S.W.2d 587 (Tenn.App.1950); Daniels v. Big Horn Federal Sav. & Loan Ass'n, 604 P.2d 1046 (Wyo.1980). See generally Annot., "Mortgagee-Lender's Duty, in Disbursing Funds, to Protect Mortgagor Against Outstanding or Potential Mechanics' Liens Against the Mortgaged Property," 30 A.L.R.4th 134 (1984).
I believe that, in the absence of controlling authority in Alabama, this court should follow the general rule that, except as it may be provided for by contract, a construction lender has no duty to verify payment of subcontractors and suppliers before disbursing loan proceeds to the general contractor. Clearly, the Bank had no contract duty to verify payment. Therefore, the trial court correctly decided that the Bank's failure to see that Ogletree paid its suppliers before the Bank disbursed construction-loan proceeds to Ogletree did not provide the basis for any claimin tort or in contractagainst the Bank.
Judge Yates also concludes that the Cooleys presented substantial evidence indicating that the $43,475 cost overrun on the contract was somehow attributable to the Bank's malfeasance. I can find no evidence supporting that conclusion. On the contrary, I believe the evidence showed without dispute that the increase in the cost of construction was due, in part, to Ogletree's having underestimated the project, and, in part, to the Cooleys' having made change orders. The Cooleys simply presented no evidence to indicate that either increase was attributable to a breach of the duty to inspect on the part of the Bank. Cf. Daniels v. Big Horn Federal Sav. & Loan Ass'n, supra, 604 P.2d at 1049 (stating that "if the borrower establishes a loss on a construction project [due to the contractor's underbidding the job and failing to pay subcontractors and materialmen] it [does not] become[] the construction lender's burden to prove that it exercised due care").

II. The Breach-of-Contract Claim

On its cross appeal, the Bank claims the Cooleys did not prove that the Bank breached its contract with them, orassuming they did prove a technical breachthat they did not prove the breach resulted in any actual damage. After carefully reviewing the record, I conclude that the Cooleys presented substantial evidence of a breach of contract, but that they failed to present any evidence of actual damage flowing from the breach.
Although the evidence was disputed, the Cooleys presented evidence sufficient for a jury to decide that the Bank breached a contractual duty to inspect the property and to determine that the percentage of work completed was commensurate with the draws requested by and given to the builder. Nevertheless, as I have previously stated in my discussion of the tort claims, I do not believe the Cooleys presented any evidence of actual damage proximately flowing from the breach.
It is hornbook law that to be entitled to damages in contract, a plaintiff must establish a causal relation between the breach and the damage the plaintiff claims to have suffered. "[D]amages for breach of contract are those which result naturally and proximately from the breach." Marshall Durbin Farms, Inc. v. Landers, 470 So.2d 1098, 1102 (Ala.1985). Where the damage claimed is remote from the breach complained of and the causal connection is speculative and contingent, there can be no recovery. See Southern Ry. v. Coleman, 153 Ala. 266, 271, 44 So. 837, 838 (1907); Restatement (Second) of Contracts § 351 (1981). The finding of a causal relation must be based on more than surmise or conjecture. The causal relation must be established by a "but for" link between the defendant's conduct and the plaintiff's loss. See Corson v. Universal Door Systems, Inc., 596 So.2d 565, 570 (Ala.1991).
*1048 Because the Cooleys proved no actual damage proximately resulting from the Bank's breach of contract, they are entitled only to nominal damages. An award of nominal damages is proper where a defendant breached a legal duty but the plaintiff either suffered no actual damage or failed to prove actual damage. James S. Kemper & Co. Southeast, Inc. v. Cox & Associates, Inc., 434 So.2d 1380, 1385 (Ala. 1983).
"An unexcused failure to perform a contract is a legal wrong. Action will lie for the breach although it causes no injury. Nominal damages are then awarded....
". . . .
"... It is axiomatic that when there is a breach of a valid and binding contract, if actual damages cannot be proved with reasonable certainty, the law infers some damages. The party whose legal right has been invaded by such breach is entitled to at least nominal damages, for the law recognizes that every injury imports damages."
11 Williston on Contracts, § 1339A at 206, 208 (3d ed.1968). To paraphrase our supreme court in Corson:
"[The Cooleys] would be entitled to nominal damages for breach of the [construction-loan contract] upon mere proof that [the Bank disbursed loan proceeds to the builder without regard to `the builder's draw schedule, ... physical inspections and percentage of work completed']. However, in order to collect more than nominal damages, [the Cooleys] must also prove that [they] actually lost money because of [the Bank's] breach, that is, that [they] would not [have had to obtain an additional $20,000 in loan proceeds from the Bank and that they would not have had to pay for cost overruns of $43,475 for their house]."
Corson v. Universal Door Systems, Inc., 596 So.2d at 569 (emphasis added).

III. The Omission of a Jury Charge on Damages for Mental Anguish

Citing Sexton v. St. Clair Federal Sav. Bank, 653 So.2d 959 (Ala.1995), Judge Yates holds that the trial court erred by failing to instruct the jury that it could award damages for mental anguish if it found in favor of the Cooleys on the breach-of-contract claim. I disagree.
In Sexton, the evidence established that the bank failed to monitor the disbursement of the construction-loan proceeds and that, as a proximate result of that failure, the builder absconded with $93,000 of the proceeds. The Sextons, who were unable to complete the construction, stopped making payments to the bank, and the bank foreclosed on its mortgage. The supreme court held that the case presented one of the "limited circumstances [in which] damages for mental anguish can properly be awarded on a breach of contract claim." Sexton, 653 So.2d at 960. Noting that contracts concerning the construction of residences are in a special category, the court held:
"`[W]here the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, it is just that damages therefor be taken into consideration and awarded....'"
Id. (quoting B & M Homes, Inc. v. Hogan, 376 So.2d 667, 671 (Ala.1979)) (emphasis added). The court added:
"[A] reasonable construction lender could easily foresee that a borrower could undergo extreme mental anguish if the lender breached a provision [to monitor the disbursement of loan proceeds]."
Sexton, 653 So.2d at 962 (emphasis added).
The language in Sexton relating to causation and foreseeability necessarily limits the holding of that case to those situations in which the lender's breach proximately caused the borrower actual damage that *1049 was within the contemplation of the parties to the contract. Because the Cooleys suffered no actual damage as a proximate result of the Bank's breach in this case, Sexton does not apply.

IV. Summary

I would affirm the judgment on the negligence, wantonness, misrepresentation, and promissory-fraud claims. I would also affirm the judgment entered on the jury verdict insofar as it holds the Bank liable for breach of contract, but I would reverse the award of damages and remand the cause with directions for the trial court to enter a judgment in favor of the Cooleys for nominal damages only.
THOMPSON, J., concurs.
NOTES
[1] We note that in Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997), our supreme court discarded the "justifiable reliance" standard and returned to a "reasonable reliance" standard. However, the new standard applies to all fraud cases filed after March 14, 1997, and, thus, does not apply to the present case, which was filed in January 1995.