I concur in the affirmance of the summary judgment as to the promissory-fraud claim. I dissent, however, from the reversal as to the remaining claims. I would affirm the judgment as to the negligence, wantonness, and misrepresentation claims. As to the judgment entered on the jury verdict on the breach-of-contract claim, I would affirm as to the finding of the Bank's liability but reverse as to the award of damages.
The Cooleys' argument regarding the Bank's liability is the same for all their claims; namely, that the Bank erred by advancing payments to Ogletree for work he had not completed according to the draw schedule. Judge Yates's opinion for the court concludes that the Cooleys presented substantial evidence supporting their theory of the case and that they were entitled, therefore, to have a jury decide their claims. I agree that the Cooleys did, for most of their claims, present substantial evidence indicating that the bank breached a duty to them — either a tort duty or a duty imposed by contract. However, I disagree with the conclusion that the Cooleys presented substantial evidence — or, in fact, any evidence — indicating that the Bank's alleged breach of duty was the proximate cause of the damage the Cooleys suffered.
 "A proximate cause issue is ordinarily a question of fact to be determined by a jury. It becomes a question of law, however, when `there is a total lack of evidence from which the factfinder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury.' Davison [v. Mobile Infirmary], 456 So.2d [14] at 24 [(Ala. 1984)]."
Green v. Alabama Power Co., 597 So.2d 1325, 1327-28 (Ala. 1992).
 I. The Tort Claims
Judge Yates's opinion makes much of the fact that the Cooleys' expert testified, *Page 1045 
and the Bank employees acknowledged, that the Bank's form for the draw schedule was "inadequate" for the kind of construction work Ogletree performed for the Cooleys. That testimony was a red herring and may have been used at trial to throw the jury off track. The "inadequacy" referred to is the fact that the form based the draw schedule on a residence with a conventional foundation, whereas the Cooleys' house on Ono Island was built on pilings. Ms. McConnell testified that she inspected the construction site before the first draw and checked off, on the draw-schedule form, that the foundation was complete when, in fact, the house had no foundation. Judge Yates's opinion for the court fails to recount McConnell's further testimony that, although the house had no foundation, the support system it did have (the pilings) was complete by the time of the first draw.
Ogletree, the builder, received three draws — in April, May, and July 1993. At the time of the first draw, the Bank estimated that the construction was 22% complete; it paid Ogletree accordingly. At the time of the second draw, the Bank estimated that the project was 35% complete, and it gave Ogletree a draw representing the same percentage. At the third draw, the Bank estimated that the work was 48% complete, and it paid Ogletree that percentage of the contract price. At trial, Mr. Cooley testified that he did not dispute the Bank's assessment of the percentage of the work completed before any of the draws. Although Mr. Cooley was, as Judge Yates's opinion for the court states, in Maryland during the initial phase of the construction, he was back in Alabama and was physically present at the construction site at the time of each draw. The Bank sought and received Mr. Cooley's approval before giving Ogletree each draw.
The purpose for requiring that a builder's draws be commensurate with the percentage of the work completed is to maximize the builder's incentive to stay on the job until it is complete and to minimize the builder's temptation to abscond with any excess funds. See, e.g., Sexton v. St. Clair Federal Sav.Bank, 653 So.2d 959 (Ala. 1995). That purpose was served here, and the Cooleys presented no evidence to the contrary.
The Cooleys' problems began after the third draw. At that time, Mr. Cooley learned that Ogletree had not paid a supplier for approximately $20,000 worth of materials used in the house. Cooley then met with loan officials at the Bank and determined that Ogletree had approximately $23,000 worth of unpaid invoices from subcontractors and suppliers. The parties decided that, until the project was complete, the Bank would pay subcontractors and suppliers directly. The Bank did not continue to pay Ogletree after it learned of the problem. Instead, it took immediate action to remedy the problem and to prevent it from recurring.
After the third draw, approximately $80,000 — or 52% — of the loan proceeds remained. Significantly, 52% of the work also remained to be done. However, in response to a request from the Bank, Ogletree calculated that it would cost $98,000 to complete the project. Because it appeared that there would be a shortfall of $18,000 in loan proceeds necessary to finish the job, the Cooleys refinanced their construction loan and increased the amount of their indebtedness to the Bank by $20,000. Mr. Cooley testified that he paid $3,693 in interest on the additional loan, for a total new indebtedness of $23,693. In fact, the cost to complete the project was not $98,000, but $124,000. The residence Ogletree had contracted to build for $163,200 ended up costing $206,675.
The theory on which the Cooleys based their negligence, wantonness, and misrepresentation claims was that, although the Bank had a duty to disburse funds to the builder only after physically inspecting the property and determining that the percentage of work completed was commensurate *Page 1046 
with the draw requested, the Bank's site inspections were faulty and, in one instance, occurred after the builder had already received a draw for the work being inspected. Specifically, the Cooleys relied on the following irregularities in the Bank's inspections to show negligence, wantonness, and misrepresentation: (1) the April inspection indicated that termite treatment and concrete work had been completed when, the Cooleys claim, neither had been done; (2) the July inspection indicated that the plumbing and electrical rough-ins had been completed when, the Cooleys claim, neither had been done; and (3) the builder was given his third draw before the Bank made the third site inspection.
The Bank presented evidence refuting each of the Cooleys' claimed irregularities. Clearly, then, the question whether the Bank breached a tort duty to the Cooleys was disputed. What was not disputed, however, was whether the alleged breach proximately resulted in damage to the Cooleys.
The Cooleys presented evidence indicating that they spent $67,168 more for the construction of their home than they had initially contracted for: $23,693 in additional indebtedness to the Bank after they refinanced their loan; and $43,475 in cost overruns on their contract with Ogletree (the difference between the final cost of $206,675 and the original contract price of $163,200). However, they presented no evidence indicating that either of those amounts was attributable to a breach of the Bank's duty to inspect.
Even assuming that the Bank's inspection reports were faulty because they indicated that certain work was complete when, in fact, it was incomplete, the Cooleys failed to show that the faulty inspection reports resulted in any damage to them. Although Mr. Cooley challenged the accuracy of specific sections of the inspection reports — such as whether the termite treatment, or the concrete, electrical, and plumbing work had been performed when the Bank indicated that it was performed — he admitted that the Bank's assessment of the percentage of the work completed before each draw was accurate and that he approved each draw. The Cooleys presented no evidence to indicate that, if the inspection reports had been more precise, they would not have been required to increase their loan indebtedness to the Bank or to pay for cost overruns on their contract with Ogletree.
The evidence was undisputed that the $23,693 increase in the construction loan from the Bank was to cover the cost of Ogletree's failure to pay his suppliers. In support of its holding that the Cooleys presented substantial evidence indicating that the Bank's actions proximately caused their loss, Judge Yates cites the following testimony from the Cooleys' expert, a banking consultant:
 "It was improper to provide a check directly to the contractor without requiring that the check be endorsed by both the contractor and subcontractors to ensure that all parties received payment."
See 773 So.2d at 1042. With all due respect to Judge Yates and to the Cooleys' banking consultant, I point out that the foregoing testimony does not correctly state the law with respect to the duty of a construction lender.
Although the issue has not been addressed in Alabama, the general rule is that, in the absence of an obligation imposed by contract, a construction lender has no duty to see that a general contractor has paid his subcontractors and suppliers before the lender disburses loan proceeds to the general contractor See, e.g., Construction Lender, Inc. v. Sutter,228 Ga. App. 405, 491 S.E.2d 853 (1997); Spurlock v. Fayette FederalSav. Loan Ass'n, 436 N.E.2d 811 (Ind.App. 1982); Bollinger v.Livingston State Bank Trust Co., 187 So.2d 784 (La. 1966);First Nat'l State Bank of New Jersey v. Carlyle House, Inc.,102 N.J. Super. 300, 246 A.2d 22 (1968), aff'd, 107 N.J. Super. 389,258 A.2d 545 *Page 1047 
(1969), cert. denied, 55 N.J. 316, 261 A.2d 359 (1970);Gardner Plumbing, Inc. v. Cottrill, 44 Ohio St.2d 111,338 N.E.2d 757 (1975); Goodner v. Lawson, 33 Tenn. App. 676,232 S.W.2d 587 (Tenn.App. 1950); Daniels v. Big Horn Federal Sav. Loan Ass'n, 604 P.2d 1046 (Wyo. 1980). See generally Annot., "Mortgagee-Lender's Duty, in Disbursing Funds, to Protect Mortgagor Against Outstanding or Potential Mechanics' Liens Against the Mortgaged Property," 30 A.L.R.4th 134 (1984).
I believe that, in the absence of controlling authority in Alabama, this court should follow the general rule that, except as it may be provided for by contract, a construction lender has no duty to verify payment of subcontractors and suppliers before disbursing loan proceeds to the general contractor. Clearly, the Bank had no contract duty to verify payment. Therefore, the trial court correctly decided that the Bank's failure to see that Ogletree paid its suppliers before the Bank disbursed construction-loan proceeds to Ogletree did not provide the basis for any claim — in tort or in contract — against the Bank.
Judge Yates also concludes that the Cooleys presented substantial evidence indicating that the $43,475 cost overrun on the contract was somehow attributable to the Bank's malfeasance. I can find no evidence supporting that conclusion. On the contrary, I believe the evidence showed without dispute that the increase in the cost of construction was due, in part, to Ogletree's having underestimated the project, and, in part, to the Cooleys' having made change orders. The Cooleys simply presented no evidence to indicate that either increase was attributable to a breach of the duty to inspect on the part of the Bank. Cf. Daniels v. Big HornFederal Sav. Loan Ass'n, supra, 604 P.2d at 1049 (stating that "if the borrower establishes a loss on a construction project [due to the contractor's underbidding the job and failing to pay subcontractors and materialmen] it [does not] become the construction lender's burden to prove that it exercised due care").
 II. The Breach-of-Contract Claim
On its cross appeal, the Bank claims the Cooleys did not prove that the Bank breached its contract with them, or — assuming they did prove a technical breach — that they did not prove the breach resulted in any actual damage. After carefully reviewing the record, I conclude that the Cooleys presented substantial evidence of a breach of contract, but that they failed to present any evidence of actual damage flowing from the breach.
Although the evidence was disputed, the Cooleys presented evidence sufficient for a jury to decide that the Bank breached a contractual duty to inspect the property and to determine that the percentage of work completed was commensurate with the draws requested by and given to the builder. Nevertheless, as I have previously stated in my discussion of the tort claims, I do not believe the Cooleys presented any evidence of actual damage proximately flowing from the breach.
It is hornbook law that to be entitled to damages in contract, a plaintiff must establish a causal relation between the breach and the damage the plaintiff claims to have suffered. "[D]amages for breach of contract are those which result naturally and proximately from the breach." Marshall Durbin Farms, Inc. v.Landers, 470 So.2d 1099, 1102 (Ala. 1985). Where the damage claimed is remote from the breach complained of and the causal connection is speculative and contingent, there can be no recovery. See Southern Ry. v. Coleman, 153 Ala. 266, 271,44 So. 837, 838 (1907); Restatement (Second) of Contracts § 351 (1981). The finding of a causal relation must be based on more than surmise or conjecture. The causal relation must be established by a "but for" link between the defendant's conduct and the plaintiff's loss. See Corson v. Universal Door Systems, Inc.,596 So.2d 565, 570 (Ala. 1991). *Page 1048 
Because the Cooleys proved no actual damage proximately resulting from the Bank's breach of contract, they are entitled only to nominal damages. An award of nominal damages is proper where a defendant breached a legal duty but the plaintiff either suffered no actual damage or failed to prove actual damage.James S. Kemper Co. Southeast, Inc. v. Cox Associates, Inc.,434 So.2d 1380, 1385 (Ala. 1983).
 "An unexcused failure to perform a contract is a legal wrong. Action will lie for the breach although it causes no injury. Nominal damages are then awarded. . . .
". . . .
 ". . . It is axiomatic that when there is a breach of a valid and binding contract, if actual damages cannot be proved with reasonable certainty, the law infers some damages. The party whose legal right has been invaded by such breach is entitled to at least nominal damages, for the law recognizes that every injury imports damages."
11 Williston on Contracts, § 1339A at 206, 208 (3d ed. 1968). To paraphrase our supreme court in Corson:
 "[The Cooleys] would be entitled to nominal damages for breach of the [construction-loan contract] upon mere proof that [the Bank disbursed loan proceeds to the builder without regard to `the builder's draw schedule, . . . physical inspections and percentage of work completed']. However, in order to collect more than nominal damages, [the Cooleys] must also prove that [they] actually lost money because of [the Bank's] breach, that is, that [they] would not [have had to obtain an additional $20,000 in loan proceeds from the Bank and that they would not have had to pay for cost overruns of $43,475 for their house]."
Corson v. Universal Door Systems, Inc., 596 So.2d at 569 (emphasis added).
III. The Omission of a Jury Charge on Damages for MentalAnguish
Citing Sexton v. St. Clair Federal Sav. Bank, 653 So.2d 959
(Ala. 1995), Judge Yates holds that the trial court erred by failing to instruct the jury that it could award damages for mental anguish if it found in favor of the Cooleys on the breach-of-contract claim. I disagree.
In Sexton, the evidence established that the bank failed to monitor the disbursement of the construction-loan proceeds and that, as a proximate result of that failure, the builder absconded with $93,000 of the proceeds. The Sextons, who were unable to complete the construction, stopped making payments to the bank, and the bank foreclosed on its mortgage. The supreme court held that the case presented one of the "limited circumstances [in which] damages for mental anguish can properly be awarded on a breach of contract claim." Sexton, 653 So.2d at 960. Noting that contracts concerning the construction of residences are in a special category, the court held:
 "`[W]here the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, it is just that damages therefor be taken into consideration and awarded. . . .'"
Id. (quoting B M Homes, Inc. v. Hogan, 376 So.2d 667, 671 (Ala. 1979)) (emphasis added). The court added:
 "[A] reasonable construction lender could easily foresee that a borrower could undergo extreme mental anguish if the lender breached a provision [to monitor the disbursement of loan proceeds]."
Sexton, 653 So.2d at 962 (emphasis added).
The language in Sexton relating to causation and foreseeability necessarily limits the holding of that case to those situations in which the lender's breach proximately caused the borrower actual damage that *Page 1049 
was within the contemplation of the parties to the contract. Because the Cooleys suffered no actual damage as a proximate result of the Bank's breach in this case, Sexton does not apply.
 IV. Summary
I would affirm the judgment on the negligence, wantonness, misrepresentation, and promissory-fraud claims. I would also affirm the judgment entered on the jury verdict insofar as it holds the Bank liable for breach of contract, but I would reverse the award of damages and remand the cause with directions for the trial court to enter a judgment in favor of the Cooleys for nominal damages only.
Thompson, J., concurs.